2014 CO 70

In re The PEOPLE of the State
of Colorado, Plaintiff

v.

Conley M. HOSKINS and Jane Medicals,
LLC, Defendants

Supreme Court Case No. 13SA245

Supreme Court of Colorado.

September 8, 2014

John W. Suthers, Attorney General, Michael W. Melito, Assistant Attorney General, Erin K. Grundy, Assistant Attorney General, Jacob R. Lofgren, Assistant Attorney General, Denver, Colorado, Attorneys for Plaintiff.

Walta LLC, Mark G. Walta, Denver, Colorado, Hershey Decker, Kari Hershey, Lone Tree, Colorado, Attorneys for Defendant.

JUSTICE MÁRQUEZ delivered the Opinion of the Court.

¶ 1 This original proceeding arises in a criminal case involving Colorado Organized Crime Control Act ("COCCA") and other felony charges against several defendants involved in the medical marijuana industry. Petitioners Conley Hoskins and Jane Medicals, LLC (collectively, "Petitioners") seek to vacate the trial court's order disqualifying the law firm of Peters Mair Wilcox ("PMW")[1] as their counsel. The trial court disqualified

PMW under Rule 1.9(a) of the Colorado Rules of Professional Conduct, finding that the firm previously represented another party, All Care Wellness Centers, LLC ("All Care"), in the same matter for which PMW now represents Petitioners and concluding that All Care and Petitioners have materially adverse interests. Petitioners sought review of the trial court's order under C.A.R. 21, contending that the trial court abused its discretion in disqualifying Petitioners' retained counsel of choice.

¶ 2 We issued a rule to show cause and now hold that, because the record before us is insufficient to support a finding that the interests of Petitioners and All Care are materially adverse in this criminal proceeding, the trial court abused its discretion by disqualifying Petitioners' retained counsel of choice under Colo. RPC 1.9(a). Accordingly, we make the rule absolute, reverse the trial court's order disqualifying Petitioners' counsel of choice, and remand this case to the trial court for further proceedings.

## I. Facts and Procedural History

¶ 3 Petitioners, Conley Hoskins ("Hoskins") and Jane Medicals, LLC ("Jane Medicals"), are defendants in a district court action in which they and several others are charged with COCCA violations and numerous other felonies.

¶ 4 Hoskins owns or partially owns several businesses, including All Care and Jane Medicals, both of which are medical marijuana businesses. Hoskins is the sole owner of Jane Medicals. Prior to August 2011, he was the sole owner of All Care. On August 10, 2011, Hoskins and Rafael Craveiro ("Craveiro") entered into a Membership Interest Purchase Agreement under which Craveiro acquired a 50 percent membership interest in All Care.

¶ 5 In July 2012, the Colorado Department of Revenue ("DOR") began to investigate whether certain businesses connected to Hoskins were in compliance with Colorado tax laws and regulations governing the

---

**1.** PMW is comprised of Stephen C. Peters, Todd E. Mair, and Ronald L. Wilcox. Although the record reflects that Peters initially represented Hoskins and several entities in the underlying

investigation, all three attorneys became involved in the case. We therefore refer simply to "PMW."

medical marijuana industry. In September 2012, PMW notified DOR that it had been retained to represent Hoskins, Jane Medicals, All Care, and others involved in the DOR investigation. PMW arranged for employees of All Care and Jane Medicals to be interviewed by DOR officials. PMW informed the employees that it represented the business entities and Hoskins, but not the employees personally. Following these interviews, a statewide grand jury returned an indictment on May 30, 2013, charging Hoskins, Jane Medicals, All Care, and other individuals and entities with violations of COCCA and numerous other felonies. PMW entered an appearance in the criminal case on behalf of Hoskins and Jane Medicals. PMW did not enter an appearance for All Care, and All Care later retained other counsel.

¶ 6 The indictment, which contains 71 counts, generally alleges that the defendants associated to form a criminal enterprise that engaged in racketeering and conspiracy activity, including tax evasion, theft, and illegal distribution of marijuana. Hoskins, Jane Medicals, and All Care are co-defendants in several of the counts in the indictment. All 15 counts in the indictment against All Care also name Hoskins.

¶ 7 On August 2, 2013, the prosecution moved to disqualify PMW as Petitioners' counsel, alleging that PMW's prior representation of All Care during the DOR investigation was in actual conflict with its current representation of Petitioners. Specifically, the prosecution asserted that PMW learned confidential information about All Care's business dealings, financial data, and trade secrets during the DOR investigation. The prosecution argued that PMW might pursue a defense theory that All Care employees were responsible for any illicit activities and that, if PMW pursued this blame-shifting defense, All Care would be "disadvantaged by [PMW's] knowledge of sensitive and prej-

udicial information obtained during the prior representation." The prosecution pointed to a letter from PMW to the prosecution during the investigation stating that PMW "originally became involved on Mr. Hoskins' behalf in response to tax and employment issues arising from the malfeasance of key managerial employees." Although this letter did not mention All Care or any of the numerous businesses owned by Hoskins, the prosecution argued that this sentence "possibly foreshadow[ed] [PMW's] intention to distance Hoskins from legal culpability and instead shift liability to the [All Care] employees." Finally, the prosecution stated that it intended to "call All Care to testify against Hoskins and Jane Medicals" and that PMW ethically would be unable to cross-examine its former client. However, the prosecution never identified who it would call to testify as "All Care" or the nature of such testimony.

¶ 8 Based on these assertions, the prosecution argued that PMW's prior representation of All Care created a conflict in violation of Colo. RPC 1.9 because the interests of Petitioners and All Care are materially adverse under Colo. RPC 1.9(a).[2] Colo. RPC 1.9(a) provides that a lawyer who has formerly represented a client in a matter shall not later represent another person "in the same or a substantially related matter" in which that person's interests are "materially adverse" to the interests of the former client, unless the former client consents in writing to the representation. The prosecution asserted that All Care, through 50 percent owner Craveiro, had not given written consent for PMW to represent Petitioners in the criminal case.

¶ 9 In response to the prosecution's motion to disqualify, Hoskins argued that the prosecution had not met its burden to specify facts demonstrating that his interests and All Care's interests are materially adverse. Hoskins argued that he is a 50 percent owner of All Care and, during the relevant time

---

2. The prosecution also alleged a violation of Colo. RPC 1.7, governing conflicts of interest with regard to current clients. The trial court order does not address Colo. RPC 1.7; therefore, we do not address it here. Accordingly, we do not address the prosecution's contention, raised below, that a Colo. RPC 1.7 conflict exists under the theory that monetary transactions between PMW and Petitioners (i.e., payments from Petitioners for PMW's legal services during the investigation) could be considered to violate federal money-laundering statutes. The People do not reassert those allegations before us.

frame under the indictment, he was the principal manager of All Care. He also argued that he was the primary, and perhaps the only, high managerial agent of All Care, such that any criminal liability that might attach to All Care would have to be premised on his conduct. Thus, he argued, his interests were aligned with All Care's interests. He contended that the prosecution's conflict claim was founded on a "pyramid" of assumptions regarding future events, including that: (1) All Care and Hoskins will be tried jointly; (2) PMW will develop a blame-shifting defense directed to key managerial employees of All Care; (3) the prosecution will present adverse testimony from a yet-to-be-identified All Care witness; and (4) PMW will seek to discredit that testimony to All Care's detriment using confidential information obtained during its prior representation of All Care. Hoskins (through PMW) also took issue with the prosecution's reliance on PMW's letter referring to "malfeasance of key managerial employees." PMW argued that this reference was to tax and employment issues that arose at Hoskins' car wash businesses and that this was known to the prosecution.

¶ 10 Approximately two weeks after the prosecution filed its motion to disqualify, Craveiro's attorney sent a letter to PMW notifying the firm that, pursuant to Section 1 in All Care's Operating Agreement, Hoskins had forfeited his ownership interest in All Care on or around July 19, 2013. Under Section 1 of the Agreement, a manager's ownership in All Care is deemed forfeited if a manager is charged with a felony and fails to "cure said obstructions to ownership" within 30 days. In the letter, Craveiro alleged that Hoskins had been charged with several dozen felonies and had failed to cure this obstruction to ownership within the 30-day period. At the time Petitioners sought review under C.A.R. 21, Hoskins and Craveiro were in arbitration concerning their ownership interests in All Care.

¶ 11 On August 28, 2013, Craveiro, who is not a party to this criminal proceeding, filed an "amicus brief" through his personal attorney in support of the prosecution's motion to disqualify PMW.[3] The trial court accepted this filing over Petitioners' objection. That same day, the trial court held an evidentiary hearing on the prosecution's motion to disqualify. Testimony at the hearing established that a dispute had developed between Craveiro and Hoskins over the ownership of All Care and over the fact that an employee[4] had removed marijuana and cash from the All Care store location.

¶ 12 At the hearing, Craveiro testified on cross-examination that he was just a manager of the LLC "on paper" and never actually assumed a managerial role or performed management duties for All Care. He acknowledged that Hoskins was responsible for hiring and firing employees for All Care, handling the bank accounts and tax matters, and hiring the certified public accountant and attorneys for the business. He also agreed that all of the alleged conduct at issue in the criminal case occurred while Hoskins was the manager of All Care. Craveiro further acknowledged that he did not transmit any confidential information pertaining to All Care to PMW during the DOR investigation. Rather, he testified that he believed the confidential information PMW obtained during its representation of All Care concerned his personal financial information that was submitted to the state and the City of Lakewood during All Care's licensure process. He later acknowledged that all of those documents had been provided to the government, which then provided them back to Hoskins, and that there was nothing confidential about that information. Although Craveiro testified that he objected to PMW's representing Hoskins, he agreed that as an owner of All Care, Hoskins had full knowledge of, and access to, all of All Care's business records and that Hoskins could share that information with any individual counsel he retained.

---

3. The amicus brief asserts that PMW "undoubtedly learned confidential information concerning *Mr. Craveiro* through its previous representation of All Care." (Emphasis added). For this reason, Craveiro asserted that his interests and All Care's interests are materially adverse to Hoskins.

4. The employee, Brittany Sansburn, is *not* charged in the indictment.

He also acknowledged that, during a conference call with Craveiro and counsel for All Care on July 16, 2013, Hoskins and PMW expressed their interest in ensuring that All Care continue to operate. When asked to describe the conflict between All Care and PMW, Craveiro responded, "I guess that's a difficult question. I think in some of the replies that I have seen from my counsel to them, that they are not looking after the best interests of the company."

¶ 13 PMW took the position at the hearing that it did not possess any confidential information that would adversely affect All Care and that, although Craveiro and Hoskins obviously had a separate dispute regarding ownership issues, no conflict existed in the criminal case because Hoskins had an interest in ensuring that All Care succeeded as a business. Petitioners' legal ethics expert, Ronald Nemirow, opined that, based on his review of the case, hearing testimony, applicable case law, and ethics rules, nothing suggested that Hoskins' interests were adverse to All Care's interests with regard to the criminal case. Specifically, he saw nothing alleged in the indictment against All Care that was not also alleged against Hoskins, and he saw no indication beyond mere speculation that Hoskins intended or had a motive to blame someone else for the conduct of All Care. He opined that under section 18–1–606, C.R.S. (2013), a corporation can only be held liable through the acts of a high managerial agent, such as Hoskins or Craveiro, but that Craveiro had testified that, as a practical matter, he had not managed the entity. In addition, he opined that even if the arbitration ultimately determined that Hoskins had forfeited his ownership interest in All Care, Hoskins still had an interest in ensuring that the entity's value remained maximized because Hoskins would be entitled to a buyout under the Operating Agreement. Nemirow also observed that, as an owner of All Care, Hoskins is entitled to all of All Care's records, and that he would be entitled to give those records to whomever he chose to represent him as counsel. He opined that because any successor law firm would have access to the same information regarding All Care that PMW has, disqualification of PMW would not accomplish anything. Finally, Nemirow testified that even if it were to Hoskins' advantage to try to shift blame to All Care employees, any prejudice from this defense strategy would be cured by severing the trials.

¶ 14 On August 30, 2013, the trial court issued an order disqualifying PMW from representing Petitioners. The trial court found that PMW's previous representation of All Care in the DOR investigation gave rise to a conflict under Colo. RPC 1.9(a) because it was the same matter that was currently before the court in which PMW now represented Petitioners. The trial court concluded that Petitioners and All Care are materially adverse, reasoning that "other managers and employees of All Care" were indicted for the same or related conduct as Hoskins regarding the management of All Care, and therefore finding that "it is more than speculation that Hoskins will not only deny culpability for the criminal conduct that has been alleged against him, but will also attempt to shift blame for the offenses onto other employees and/or managers of All Care." As support for this conclusion, the court relied on the letter from PMW to the prosecution during the DOR investigation, which stated that PMW "originally became involved on Mr. Hoskins' behalf in response to tax and employment issues arising from the malfeasance of key managerial employees." The trial court further reasoned that "All Care will certainly attempt to shift blame for any illegal behavior away from its other employees and managers and solely onto Hoskins," and that All Care could argue that Hoskins was acting on his own behalf and not as manager of All Care when he engaged in unlawful behavior. The trial court determined that Hoskins' and All Care's trials likely will be severed, but that severance would be insufficient to cure the conflict because PMW obtained confidential information about All Care and "there is no adequate method by which this Court could fashion a remedy that would assure that none of that confidential information would be used by PMW."

¶ 15 Petitioners then petitioned this court to issue a rule to show cause under C.A.R.

21. We issued the show cause order and now make the rule absolute.

## II. Original Jurisdiction

¶ 16 Original relief pursuant to C.A.R. 21 is an extraordinary remedy that is limited in purpose and availability. *People v. Darlington*, 105 P.3d 230, 232 (Colo. 2005). This court may exercise original jurisdiction where the normal appellate process would prove inadequate. *Warden v. Exempla, Inc.*, 2012 CO 74, ¶ 16, 291 P.3d 30, 34. We exercise our original jurisdiction in this case because, if the trial court's ruling is allowed to stand, Petitioners must proceed to trial without their counsel of choice. *See, e.g., People v. Nozolino*, 2013 CO 19, ¶ 8, 298 P.3d 915, 918; *People v. Harlan*, 54 P.3d 871, 875 (Colo. 2002).

## III. Standard of Review

¶ 17 A trial court's interpretation of a rule of professional conduct presents a question of law that we review de novo. *Nozolino*, ¶ 9, 298 P.3d at 918. We review a trial court's decision to disqualify counsel for abuse of discretion. *People v. Shari*, 204 P.3d 453, 457 (Colo. 2009). We will find an abuse of discretion only where the lower court's decision was manifestly arbitrary, unreasonable, or unfair. *Dunlap v. People*, 173 P.3d 1054, 1094 (Colo. 2007).

## IV. Analysis

¶ 18 The issue before this court is whether the trial court abused its discretion in disqualifying Petitioners' retained counsel of choice. We begin with a discussion of a criminal defendant's right to be represented by counsel of choice. We then discuss Colo. RPC 1.9(a), which governs an attorney's duties to former clients. Whether the trial court abused its discretion in disqualifying PMW under Colo. RPC 1.9(a) requires us to determine whether the current criminal matter against Petitioners is the "same or substantially related" to the DOR investigation and whether Petitioners' interests are "materially adverse" to All Care's interests. We conclude that, for purposes of Colo. RPC 1.9(a), the two matters are the same or substantially related, but that the record before

us is insufficient to support a finding that the interests of Petitioners and All Care are materially adverse in this criminal proceeding. We therefore hold that the trial court abused its discretion by disqualifying Petitioners' retained counsel of choice under Colo. RPC 1.9(a). Accordingly, we make the rule absolute, reverse the trial court's order disqualifying Petitioners' counsel of choice, and remand this case to the trial court for further proceedings.

### A. A Criminal Defendant's Right to Counsel of Choice

¶ 19 "A defendant's right to be represented by counsel of choice is grounded in the jurisprudence of the sixth amendment to the United States Constitution and is entitled to great deference." *Rodriguez v. Dist. Court*, 719 P.2d 699, 705 (Colo. 1986). "This guarantee reflects the substantial interest of a defendant in retaining the freedom to select an attorney the defendant trusts and in whom the defendant has confidence." *Id.* at 705–06. A defendant's right to select an attorney the defendant trusts is considered to be central to the adversary system and of substantial importance to the integrity of the judicial process. *People v. Brown*, 2014 CO 25, ¶ 16, 322 P.3d 214, 219 (internal quotation marks and citation omitted). "As such, we afford this right great deference." *Id.* (internal quotation marks and citation omitted).

¶ 20 However, the Sixth Amendment right to counsel of choice is not absolute and must give way under certain circumstances. *People v. Frisco*, 119 P.3d 1093, 1095 (Colo. 2005) (citing *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)). "In some circumstances, fundamental considerations other than a defendant's interest in retaining a particular attorney are deemed of controlling significance." *Rodriguez*, 719 P.2d at 706. "These considerations relate to the paramount necessity of preserving public confidence in the integrity of the administration of justice." *Id.* To that end, courts retain the discretion to disqualify attorneys from further representation. *In re Estate of Myers*, 130 P.3d 1023, 1025 (Colo. 2006).

¶ 21 Although disqualification is a matter of trial court discretion, the court must take into account the importance of continued representation of a party by his or her counsel of choice. *Nozolino*, ¶ 13, 298 P.3d at 919. This is particularly true in the criminal context, where the defendant's Sixth Amendment right to counsel of his or her choice is at stake. "Disqualification of a party's chosen attorney is an extreme remedy and is only appropriate where required to preserve the integrity and fairness of the judicial proceedings." *Id.*; *accord Estate of Myers*, 130 P.3d at 1025 ("[W]e have made clear that disqualification is a severe remedy that should be avoided whenever possible."). We have noted that courts are "highly cynical" of motions to disqualify opposing counsel in light of their potential use as dilatory or tactical devices. *See Fognani v. Young*, 115 P.3d 1268, 1272 (Colo. 2005); *Estate of Myers*, 130 P.3d at 1025. A defendant's choice of counsel will not lightly be denied, particularly where the court's concern lies not with protecting the defendant, but instead with protecting the interests of former clients, avoiding mistrial or reversal from later-materializing actual conflicts, or undermining public confidence in the impartiality and fairness of the process. *Frisco*, 119 P.3d at 1095.

¶ 22 The moving party has the burden of establishing that disqualification is proper. *People v. Harlan*, 54 P.3d 871, 877 (Colo. 2002). That burden is met only where the motion to disqualify sets forth specific facts showing a "clear danger that prejudice to a client or adversary would result from continued representation." *Estate of Myers*, 130 P.3d at 1025. "The required showing of prejudice cannot be based on mere speculation or conjecture." *Nozolino*, ¶ 13, 298 P.3d at 919. Additionally, the trial court must determine that any remedy short of disqualification would be ineffective. *Id.*

## B. Colorado Rule of Professional Conduct 1.9(a)

¶ 23 Here, the prosecution alleges that a conflict of interest exists under Colo. RPC 1.9 based on PMW's prior representation of All Care during the DOR investigation and its current representation of Petitioners in this criminal proceeding.

¶ 24 Colo. RPC 1.9[5] governs an attorney's duties to former clients. Subsection (a) states that a lawyer who has formerly represented a client shall not later represent another client in the same or a substantially related matter in which the two clients' interests are materially adverse:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Colo. RPC 1.9(a).[6]

¶ 25 The party seeking disqualification must show that: "(1) an attorney-client relationship existed in the past; (2) the present litigation involves a matter that is 'substantially related' to the prior litigation; (3) the present client's interests are materially adverse to the former client's interests; and (4) the former client has not consented to the disputed representation after consultation." *Funplex P'ship v. F.D.I.C.*, 19 F.Supp.2d 1201, 1206 (D.Colo. 1998) (internal quotation marks and citation omitted) (applying Colo. RPC 1.9).

¶ 26 Importantly, Colo. RPC 1.9 "applies only to situations involving an inherent and substantial risk of violating an attorney's duty of loyalty to former clients." *Frisco*, 119 P.3d at 1096. The prohibition of Rule 1.9 is "therefore limited to representations that combine the same or substantially related legal disputes with a motive to harm a for-

---

5. Colo. RPC 1.9 is identical to Rule 1.9 of the Model Rules of Professional Conduct from the American Bar Association.

6. Colo. RPC 1.9(c) separately prohibits the use of information from a prior representation to the disadvantage of the former client; therefore, Colo. RPC 1.9(a) applies only to situations involving an "inherent and substantial risk" of violating an attorney's duty of loyalty to former clients. *Frisco*, 119 P.3d at 1096.

mer client, in order to advance the interests of a current client." *Id.*

¶ 27 Here, it is undisputed that PMW previously represented All Care and that All Care—through Craveiro—has not consented to PMW's representation of Petitioners in this current matter. In addition, it does not appear to be disputed that, for the purposes of Colo. RPC 1.9, the current criminal matter involving PMW as counsel for Petitioners is "the same or a substantially related matter" as the underlying DOR investigation in which PMW represented All Care.[7] Information obtained during the DOR investigation gave rise to the criminal indictment against Petitioners, and, according to the People, the interviews conducted with employees of All Care and Jane Medicals during the DOR investigation "ultimately formed the factual basis of portions of the indictment." *See* Colo. RPC 1.9 cmt. 3 ("Matters are 'substantially related' for purposes of this Rule if they involve the same transaction or *legal dispute* ...." (emphasis added)). Thus, the central question in this case becomes whether the interests of Petitioners and All Care are materially adverse in this criminal proceeding.

## C. Insufficient Showing That Interests Are Materially Adverse

¶ 28 As discussed above, the severe remedy of disqualification of a criminal defendant's counsel of choice "should be avoided whenever possible." *Estate of Myers*, 130 P.3d at 1025. Disqualification under Colo. RPC 1.9(a) is "limited to representations that combine the same or substantially related legal disputes with a motive to harm a former client, in order to advance the interests of a current client." *Frisco*, 119 P.3d at 1096. The party seeking to disqualify must set forth specific facts, not based on mere speculation or conjecture, that show a "clear

danger" of prejudice to a client or adversary. *See Estate of Myers*, 130 P.3d at 1025.

¶ 29 We conclude that the prosecution failed to meet its burden to show that, for purposes of Colo. RPC 1.9(a), the interests of Petitioners and All Care are materially adverse in this criminal proceeding. The record before us does not reflect specific facts, beyond mere speculation, showing a clear danger of prejudice or a motive to harm All Care in order to advance Hoskins' interests in this criminal case. Because the record is insufficient to support a finding that the interests of Petitioners and All Care are materially adverse in this criminal proceeding, disqualification is not required under Colo. RPC 1.9(a), and the trial court therefore abused its discretion in granting the motion to disqualify PMW as Petitioners' retained counsel of choice.

¶ 30 The prosecution's claim[8] that PMW's prior representation of All Care presents a conflict under Rule 1.9(a) is based on the argument that PMW acquired confidential information about All Care that could be used against it in this criminal proceeding. However, the prosecution's argument presumes that the defendants will be tried together, although the trial court's order indicates that severance is likely. It further presumes that "All Care" will be called to testify against Hoskins, although the prosecution has never identified who, precisely, will testify on behalf of the entity, nor has it described the nature of such testimony or how it would be adverse to Hoskins.

¶ 31 In addition, the prosecution's argument presumes that Hoskins will attempt to shift blame to other All Care employees whose actions would subject All Care to criminal liability without implicating Hoskins. This blame-shifting argument assumes that other employees of All Care qualify as "high managerial agents" under section 18-1-606,

7. Petitioners did not seriously contest this issue below. Their petition assumes—without conceding—that this element has been satisfied.

8. It is of some significance that the motion to disqualify was brought by the prosecution, not All Care. *See Rodriguez*, 719 P.2d at 707 ("[I]t is of some significance that [the former-client-turned-witness] ... did not join the prosecution's

motion to disqualify."). All Care did not join the motion; at most, Craveiro, acting through his individual attorney, filed a non-party "amicus brief" with the trial court supporting the motion. Counsel for All Care was present at the hearing on the motion to disqualify but did not examine witnesses or present argument to the court.

C.R.S. (2013), and can therefore subject All Care to criminal liability. Section 18–1–606(1)(b) provides:

> A business entity is guilty of an offense if ... [t]he conduct constituting the offense is engaged in, authorized, solicited, requested, commanded, or knowingly tolerated by the governing body or individual authorized to manage the affairs of the business entity or by a high managerial agent acting within the scope of his or her employment or in behalf of the business entity.

¶ 32 However, the record before us indicates that Hoskins was the sole high managerial agent during the relevant time periods in the indictment. The indictment charges All Care, as a business entity, with a total of 15 counts, including racketeering and conspiracy under COCCA, cultivation and distribution of marijuana, tax evasion, and theft. Two of those counts, for racketeering and conspiracy under COCCA, are alleged against all 17 defendants named in the indictment. The other 13 counts against All Care also name Hoskins,[9] but do not identify any other All Care manager or employee who would qualify as a high managerial agent responsible for All Care's alleged criminal acts. Indeed, Hoskins is the only person identified in the indictment as a "high managerial agent" of All Care.

¶ 33 Although several of the counts against All Care name Brenden Joyce and David Krause, who worked in various capacities for other entities owned or partially owned by Hoskins, and one count against All Care names attorney Dallan Dirkmaat, the prosecution does not allege that Joyce, Krause, or Dirkmaat were ever managers or employees of All Care. The prosecution presented no specific evidence at the disqualification hearing establishing that two other defendants, Nathan Newman and Ryan Tripp, were high managerial agents of All Care. To the extent that, during Craveiro's direct examination,[10] the prosecution attempted to suggest that Newman and Tripp, as store managers, were in a position to commit crimes on behalf of All Care, the court sustained the defense's objection to this question. In sum, neither the indictment nor the prosecution's briefing to the trial court nor any evidence presented at the hearing established the identity of any other All Care manager or employee who qualifies as a "high managerial agent" under section 18–1–606(1)(b).

¶ 34 Further, the prosecution's theory that Hoskins will seek to shift blame to unidentified high managerial agents of All Care is mere speculation. The prosecution—and the trial court in its order—relied on PMW's letter referring to "malfeasance of key managerial employees" as support for the proposition that Hoskins will attempt to escape legal culpability by shifting liability to other All Care employees. However, as noted above, PMW pointed out that this letter, which does not even mention All Care, was referring to tax and employment issues arising at Hoskins' car wash businesses, and that this fact was known to the prosecution. PMW has also represented in filings to the trial court and this court that Hoskins has no interest in shifting blame to All Care. And indeed, the record before us reveals no motive for Hoskins to shift blame to All Care, given that Hoskins has a continuing interest in the viability and profitability of All Care regardless of the outcome of the arbitration over the ownership dispute. Either Hoskins will continue to have a 50 percent ownership interest in All Care or he will be entitled to a compensation package under the All Care Operating Agreement.[11]

¶ 35 Likewise, the trial court's conclusion that All Care will attempt to shift blame to Hoskins is unsupported by the record. All

---

**9.** Hoskins and Jane Medicals are also charged with additional counts for which All Care is not charged.

**10.** Craveiro is not charged in the indictment.

**11.** The All Care Operating Agreement states:
If ownership is forfeited, the MANAGER shall compensate the member the sum equivalent to of [sic] one year's net earnings of the COMPA-

NY, multiplied by the percentage of ownership owned by the member at the time of forfeiture. One year's net earnings shall be calculated by taking the net earnings of the previous completed calendar months and multiplying that sum by four. The MANAGER shall have 6 months to tender payment to the member for the sum of the forfeiture.

Care has no incentive to implicate Hoskins because he was clearly a high managerial agent of All Care whose actions could subject All Care to criminal liability under section 18–1–606(1)(b). Thus, to point the finger at Hoskins only risks implicating All Care.[12] To the extent that the prosecution takes the position that other employees of All Care also qualify as high managerial agents for purposes of section 18–1–606(1)(b), neither Hoskins nor All Care has any incentive to shift blame to them either because, again, to do so only risks implicating All Care.

¶ 36 We also note that nothing in the record before us establishes that PMW received confidential information regarding All Care from anyone other than Hoskins himself, as co-owner and manager of the LLC. Thus, any counsel representing Hoskins would have access to the same information. To the extent PMW was present during the DOR's interviews of other All Care employees not represented by PMW, the notes and recordings of those interviews presumably would be available to any counsel representing Hoskins. Moreover, the prosecution's contention that PMW obtained *confidential* information about All Care through its conversations with these employees is mere speculation.

¶ 37 Finally, even assuming that Hoskins intends to seek to shift blame to All Care, any prejudice could be resolved by severance of Hoskins' and All Care's trials. The trial court reasoned that any testimony elicited from an All Care employee in the trial of Hoskins and Jane Medicals could be used against that same witness in a trial against All Care. However, such a concern can be avoided if All Care proceeds to trial first. *See Nozolino,* ¶ 13, 298 P.3d at 919 ("[T]he trial court must determine that any remedy short of disqualification would be ineffective." (internal quotation marks and citation omitted)).

¶ 38 The burden is on the moving party to establish grounds for disqualification of op-

posing counsel. *Fognani,* 115 P.3d at 1272. Disqualification can occur only after facts have been alleged that demonstrate a potential violation of the rule, and counsel cannot be disqualified on the basis of speculation or conjecture. *Id.* Because the People have failed to show a clear danger of prejudice or that Petitioners have a motive to harm All Care, the People have not met this burden. *See Frisco,* 119 P.3d at 1096; *Harlan,* 54 P.3d at 877; *Estate of Myers,* 130 P.3d at 1025.

## V. Conclusion

¶ 39 Because the record before us is insufficient to support a finding that the interests of Petitioners and All Care are materially adverse in this criminal proceeding, we hold that the trial court abused its discretion by disqualifying Petitioners' retained counsel of choice under Colo. RPC 1.9(a). Accordingly, we make the rule absolute, reverse the trial court's order disqualifying Petitioners' counsel of choice, and remand this case to the trial court for further proceedings.

CHIEF JUSTICE RICE dissents.

CHIEF JUSTICE RICE, dissenting.

¶ 40 In July 2012, Peters Mair Wilcox ("PMW"), a Colorado-based law firm, represented several parties in connection with a criminal investigation conducted by the Colorado Department of Revenue ("DOR"). PMW represented Conley Hoskins individually; additionally, it represented two medical marijuana dispensaries in which Hoskins had an ownership stake, All Care Wellness, LLC ("All Care"), and Jane Medicals, LLC ("Jane Medicals"), in their organizational capacities. PMW communicated extensively with the Senior Assistant Attorney General on behalf of these three clients during the course of its representation.[1] PMW attorneys also arranged for and participated in the DOR's investigatory interviews of Jane Medicals'

---

12. Although the trial court suggested that All Care could argue that the jury should not impute Hoskins' conduct to All Care because he was not acting as manager of All Care when he engaged in unlawful behavior, this is mere speculation and was not argued by the prosecution.

1. The trial court's order granting the People's motion to dismiss attached excerpts of these communications. The excerpts included over a dozen emails exchanged between PMW and the Senior Assistant Attorney General, as well as two letters sent from PMW to the Senior Assistant Attorney General.

and All Care's employees. During these interviews, the DOR asked employees questions about Jane Medicals' and All Care's business practices, and through its participation, PMW became privy to confidential and damaging information the employees disclosed to the DOR about both dispensaries.

¶ 41 Subsequently, the People indicted more than a dozen individuals or entities for violations of the Colorado Organized Crime Control Act ("COCCA"), among other crimes, including theft, tax evasion, securities fraud, and illegal distribution of marijuana. The indictment included 71 total counts. Specifically, it charged two of All Care's store managers, Nathan Newman and Ryan Tripp, as well as Hoskins, All Care, Jane Medicals, and others, with violations of COCCA, including "racketeering—participation in an enterprise" and "conspiracy/endeavoring." After the indictment, Ralph Craveiro, the co-owner of All Care, challenged Hoskins's ownership interest in that business. Craveiro argued that Hoskins had forfeited his 50% share when he was charged with multiple felonies. All Care's ownership status remains in dispute and is the subject of a pending arbitration proceeding.

¶ 42 Thereafter, PMW entered an appearance only on behalf of Hoskins and Jane Medicals in the criminal case, despite having previously represented a co-defendant, All Care, in the very investigation that gave rise to the indictment. In response to PMW's entry of appearance, the People filed a motion to disqualify the firm, arguing that there was an impermissible conflict of interest between PMW's former client (All Care) and its current clients (Hoskins and Jane Medicals, hereinafter "Petitioners") and that All Care did not consent to PMW's representation of Petitioners.

¶ 43 The trial court held an evidentiary hearing that included testimony from an ethics expert (in opposition to the motion) and from Craveiro (in support of the motion). In later granting the People's motion, it concluded that All Care's and Petitioners' interests were "materially adverse" to one another in violation of Colo. RPC 1.9(a). Specifically, it reasoned that: (1) Hoskins had incentives to deny culpability and to shift the blame for his alleged criminal behavior as an All Care owner and manager to All Care's other employees; and (2) the prosecution planned to call at least one All Care employee to testify against Petitioners, such that PMW would be required not only to impermissibly cross-examine a former client, but would do so with the benefit of confidential information about that client. The court considered severing the trials, but decided against doing so because PMW's exposure to confidential information about All Care during the DOR's investigatory interviews meant that severance could not prevent PMW from using that information in its defense of Petitioners.

¶ 44 Contrary to the majority, I would affirm the trial court and hold that Petitioners have materially adverse interests to those of All Care. Although the majority purports to apply the abuse of discretion standard in reversing the trial court, in actuality, it subjects the trial court's findings to a far more searching and demanding standard. Given that the record before us is more than sufficient to justify the trial court's decision, I cannot agree with the majority's conclusion that the trial court abused its discretion when it disqualified PMW as counsel for Petitioners, and I respectfully dissent.

## I. Analysis

¶ 45 First, I examine the case law regarding the abuse of discretion standard in the context of motions to disqualify counsel specifically, including the sound reasons behind that very high standard. Next, I discuss how I would have applied that standard here, and explain why the majority—despite purportedly applying that standard—in actuality applies a far more stringent standard and accordingly errs in reversing the trial court.

### A. Disqualification of Counsel and the Abuse of Discretion Standard

¶ 46 The Sixth Amendment right of criminal defendants to counsel of their choice is circumscribed in several important respects and must give way under certain circumstances. *See People v. Frisco*, 119 P.3d 1093, 1095 (Colo. 2005) (citing *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100

L.Ed.2d 140 (1988)). Although a criminal defendant's choice of a particular attorney is afforded great deference, *People v. DeAtley,* 2014 CO 45, ¶ 15, 333 P.3d 61, the "essential aim" of the Sixth Amendment "is to guarantee an effective advocate for each criminal defendant" within the adversarial process—not "to ensure that a defendant will inexorably be represented by the lawyer whom he prefers," *Wheat,* 486 U.S. at 159, 108 S.Ct. 1692.

¶ 47 A trial court's inherent power to disqualify attorneys from conflicted representation derives from its duty to ensure the integrity and fairness of the proceedings before it. *In re Estate of Myers,* 130 P.3d 1023, 1025 (Colo. 2006); *see also Liebnow by & through Liebnow v. Boston Enters. Inc.,* 2013 CO 8, ¶ 13, 296 P.3d 108 (noting that it is within the "exclusive province" of the trial court to determine if disqualification is warranted). A trial court has "broad discretion" in deciding disqualification motions. *People v. Harlan,* 54 P.3d 871, 877 (Colo. 2002). Indeed, a trial court stands in the best position to make the fact-specific determination as to whether a particular conflict would compromise the integrity of the proceeding. *See Frisco,* 119 P.3d at 1096 ("[C]ourts clearly have the responsibility to ensure that a criminal defendant receives a fair trial (even where that requires disqualification of his counsel of choice), as well as the latitude to ensure the integrity, and appearance of integrity, of the process."); *see also Wheat,* 486 U.S. at 163, 108 S.Ct. 1692 (concluding that a trial court has "substantial latitude" in determining whether to disqualify an attorney in the face of actual or potential conflicts of interest). As such, we only overturn a trial court's decision on a disqualification motion if we find that the trial court abused its discretion. *Liebnow,* ¶ 14.

¶ 48 The abuse of discretion standard is—by design—deferential to the trial court. The standard is "very high" because "it recognizes the trial court's unique role and perspective in evaluating the demeanor and body language of live witnesses, and it serves to discourage an appellate court from second-guessing those judgments based on a cold record." *Carrillo v. People,* 974 P.2d 478,

485–86 (Colo. 1999) (describing the standard in the context of juror dismissal). To constitute an abuse of discretion, the trial court's decision must be *"manifestly* arbitrary, unreasonable, or unfair." *Gen. Steel Domestic Sales, LLC v. Bacheller,* 2012 CO 68, ¶ 42, 291 P.3d 1 (emphasis added). Significantly, in determining whether a trial court's decision is manifestly arbitrary, unreasonable, or unfair, we ask whether the trial court "exceed[ed] the bounds of the rationally available choices"—not whether we agree with that decision. *Churchill v. Univ. of Colo.,* 2012 CO 54, ¶ 74, 285 P.3d 986 (internal quotation marks omitted) (quoting *Hall v. Moreno,* 2012 CO 14, ¶ 54, 270 P.3d 961).

¶ 49 We allow trial courts substantial latitude in determining whether disqualification is warranted for two reasons. First, conflicted representation undermines both the efficacy of an attorney's representation and the integrity of the legal system more generally. An attorney owes his or her client a duty of loyalty and a concomitant duty to avoid conflicts of interest; indeed, these are "perhaps the most basic of counsel's duties." *Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also* Colo. RPC 1.7 cmt. 1 (noting that loyalty is an essential element in the lawyer's relationship to a client). The importance of these duties is only heightened where counsel is representing, or has represented, criminal co-defendants. *See Wheat,* 486 U.S. at 159, 108 S.Ct. 1692 (noting the "special dangers" posed by conflicts involving multiple representation of criminal co-defendants).

¶ 50 Second, a trial court's decision about whether a conflict requires separate representation is made "not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly." *Id.* at 162, 108 S.Ct. 1692. In *Wheat,* a case disqualifying counsel from representing multiple co-defendants in a marijuana-distribution conspiracy, the United States Supreme Court explained the complexity of the decision trial courts face in determining disqualification motions:

> The likelihood and dimensions of nascent conflicts of interest are notoriously hard to

predict, even for those thoroughly familiar with criminal trials. It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants.

*Id.* at 162–63, 108 S.Ct. 1692. The broad discretion afforded to trial courts, then, is not only sensible, because trial courts are far closer to the witnesses and the evidence than are appellate courts; it is also necessary given the unavoidably difficult nature of any pretrial disqualification decision.

¶ 51 With the wide latitude afforded to trial courts in mind, I now turn to my analysis of the trial court's application of Rule 1.9(a) in this case.

## B. The Trial Court's Findings of Material Adversity Are Sufficiently Supported by the Record

¶ 52 I agree with the majority that, for purposes of Colo. RPC 1.9(a), the current criminal matter involving PMW as Petitioners' counsel constitutes "the same or a substantially related matter" as the underlying DOR investigation. Additionally, it is undisputed that All Care, as a former client of PMW's in that investigation, has not consented to PMW's representation of Petitioners. Therefore, the outcome of this case turns on whether the trial court's conclusion—that All Care's interests are "materially adverse" to Petitioners' interests—was so manifestly arbitrary, unreasonable, or unfair so as to constitute an abuse of discretion. Contrary to the majority, I would hold that the People met their burden to show that All Care's interests were materially adverse to Petitioners'. Accordingly, the trial court did not exceed the bounds of rationally available choices in finding there was "an inherent and substantial risk" of PMW violating its duty of loyalty to All Care in violation of Colo. RPC 1.9. *See Frisco,* 119 P.3d at 1096.

¶ 53 The majority concludes that it is "mere speculation" that Hoskins will seek to shift blame to other All Care employees because Hoskins was All Care's only "high managerial agent" who was specifically named in the indictment. Maj. op. ¶¶ 33–34. In other words, it concludes that there are no other individuals to whom Hoskins can shift the blame for All Care's alleged criminal malfeasance and, thus, that there is no conflict of interest because Hoskins's interests are aligned with All Care's. *See id.*

¶ 54 The record, however, does not support this conclusion; rather, it shows there is a significant risk that Hoskins will attempt to exculpate himself at the expense of All Care's employees. For example, both Nathan Newman and Ryan Tripp, two All Care managers, were indicted along with Hoskins. Specifically, the indictment alleges that Newman, Tripp, and Hoskins, along with other All Care employees, engaged in a complex criminal conspiracy which involved receiving, buying, selling, cultivating, and/or distributing marijuana. It was not manifestly arbitrary, unreasonable, or unfair for the trial court to conclude that one of Hoskins's best defense strategies would be to shift blame away from himself and onto Newman and Tripp (or, for that matter, onto other indicted or unindicted All Care employees) by claiming that they acted at their own behest in committing any alleged crimes rather than at his direction.

¶ 55 The majority also relies on section 18–1–606(1)(b), C.R.S. (2013), which provides that a business entity is guilty of an offense when that offense was "engaged in, authorized, solicited, requested, commanded, or knowingly tolerated by ... a high managerial agent acting within the scope of his or her employment or in behalf of the business entity." It notes that there were no "high managerial agents" for All Care named in the indictment besides Hoskins. Maj. op. ¶¶ 31–32. However, the majority fails to acknowledge that there was specific evidence presented at the disqualification hearing indicating that Newman and Tripp might well qualify as "high managerial agents" for All Care, even if they were not also specifically designated "high managerial agents" in the indictment. Section 18–1–606(2)(a) defines a "high managerial agent," in relevant part, as "an officer of a business entity or any other

agent in a position of comparable authority with respect to ... the supervision in a managerial capacity of subordinate employees." Craveiro, who was a witness for the People at the disqualification hearing, testified that Newman and Tripp were traditional store managers for All Care and that they had unfettered access to the marijuana and the money in All Care's store. The prosecution need not have identified these individuals as "high managerial agents" in the indictment in order for All Care to be held criminally responsible for their conduct, making them an obvious target for Hoskins's blame shifting.

¶ 56 Moreover, the record also establishes—as the trial court correctly noted—that Hoskins had already begun to point fingers and did so well in advance of trial. Specifically, during the DOR's pre-indictment investigation, PMW attorney Stephen Peters sent a letter to a Senior Assistant Attorney General entitled "Investigation of Conley Hoskins." In that letter, Peters explained that he initially began representing Hoskins "in response to tax and employment issues arising from the malfeasance of key managerial employees." Peters also offered, in the very same paragraph, to show the DOR copies of tax- and withholding-related paperwork prepared by an accountant in response to this "malfeasance" "[b]ecause the taxes are one stated theory of your proposed securities prosecution." Although the majority acknowledges the existence of this letter, it completely disregards it for purposes of the material adversity analysis, apparently because the letter did not specifically mention All Care. See maj. op. ¶ 7. However, given that the letter was sent in the context of the pre-indictment investigation of Hoskins's businesses, including All Care, it was not manifestly arbitrary, unreasonable, or unfair for the trial court to rely on the letter as a piece of evidence in support of the People's motion to disqualify. Indeed, the letter concretely demonstrates that, at least when it comes to the indictment's charges of securities fraud and tax evasion, Hoskins was already directing blame away from his own malfeasance, if any, to the "malfeasance of key managerial employees."

¶ 57 The majority's conclusion that Hoskins has no motive to blame All Care's employees or managers is also premised on its problematic assumption that Hoskins is motivated solely by his narrow financial interests in preserving All Care as a viable future entity. See maj. op. ¶ 34. Significantly, the majority makes this assumption without pointing to a single piece of evidence in the record. See id. However, it was not manifestly arbitrary, unreasonable, or unfair for the trial court to conclude that Hoskins was likely to employ a blame-shifting defense, even at the expense of losing future financial benefits from All Care, because doing so might allow him to avoid jail time or other forms of criminal sanction. If Hoskins were to successfully demonstrate that All Care's employees were serving their own prerogatives by engaging in unlawful activity—and not because Hoskins "authorized, solicited, requested, commanded, or knowingly tolerated" such activity—he could escape personal culpability, even at the risk of losing his investment in All Care.

¶ 58 Moreover, at the disqualification hearing, the trial court correctly noted that if Hoskins loses his ownership stake in All Care in the pending arbitration proceeding, he would also lose his financial interest in ensuring that All Care escapes criminal sanctions. In this respect, the majority's holding that there was no material adversity is contingent on a future third-party arbitrator's decision to preserve Hoskins's ownership share. In contrast, the trial court's decision to grant the People's motion to disqualify ensures that even if Hoskins loses his ownership share, this loss will not affect All Care's ability to defend itself.

¶ 59 The trial court's decision was justified not only because it reasonably concluded that Hoskins had obvious incentives to shift the blame onto All Care; it also was justified because the record establishes that PMW obtained confidential information[2] about All

2. Petitioners' expert opined that this information was not truly "confidential," insofar as any successor law firm hired by Hoskins would have access to the information in PMW's possession because Hoskins would simply provide this information to his new counsel. Although Hoskins

Care in the course of the pre-indictment investigation, and this information would compromise All Care's ability to defend itself and could force PMW into a position of divided loyalties. As PMW's correspondence with the Senior Assistant Attorney General makes clear, PMW took a very active approach in managing the DOR's pre-indictment interviews with All Care's employees. The trial court rationally presumed that PMW became privy to confidential information about All Care's business dealings when it (1) prepared employees for the DOR's interviews, as it was presumed to do in competently representing All Care as an entity, and (2) attended the interviews. Additionally, the prosecution indicated that it will call an All Care employee to testify against Hoskins.[3] Accordingly, in the event the trials were not severed, PMW would immediately be placed in an untenable position. On the one hand, it would have a duty to cross-examine any All Care employee effectively in representing Hoskins, and doing so could redound to the benefit of Hoskins personally. On the other hand, it could not use any confidential information learned during the course of the investigatory interviews without violating continuing duties to All Care as a former client. *See* Colo. RPC 1.9(c) (stating that a lawyer who has formerly represented a client in a matter cannot "use information relating to the representation to the disadvantage of the former client" and also cannot "reveal information relating to the representation"); *see also Dunlap v. People*, 173 P.3d 1054, 1070 (Colo. 2007) ("An attorney has a continuing duty to keep confidential any information learned during the prior representation of the witness. This duty creates the possibility that the attorney will be hindered in cross-examining the witness, which thus impedes the attorney's ability to zealously represent the current client." (internal citation omitted)).

¶ 60 The trial court also fully considered whether a remedy short of disqualification would be effective. It noted that severing the trials would not necessarily eliminate the conflict of interest implicated here because PMW was already exposed to confidential information about All Care and there was nothing the trial court could do to ensure that PMW did not use that information in defending Petitioners. Such a conclusion was justified given its finding that Hoskins would have an incentive to blame other All Care employees in his own defense.

## II. Conclusion

¶ 61 Contrary to the majority, I believe that the record presented here was more than sufficient for the trial court to find that Petitioners' interests were "materially adverse" to All Care's interests. Although it purports to apply an abuse of discretion standard in reviewing the trial court's decision, the majority actually applies a far more stringent standard and fails to recognize the substantial latitude and broad discretion afforded trial courts in making the difficult decision to disqualify counsel. Accordingly, I respectfully dissent.

might well know a significant amount about the inner workings of All Care and the activities of its employees, it is undisputed that Hoskins did not attend every single investigatory interview with All Care's employees. Accordingly, Hoskins would not be able to provide replacement counsel with precisely the same kind of confidential, and damning, information about All Care as that which was provided to PMW during the pre-indictment interview process of All Care's employees.

**3.** The majority asserts that the People did not meet their burden to show material adversity in part because they did not identify precisely by name which witness they intended to call to testify against Petitioners and did not explain precisely why that witness's testimony would be adverse. *See* maj. op. ¶ 29. It cites, however, no authority requiring such precision in identification. Additionally, it is a perfectly logical assumption that the testimony offered by any such employee would be adverse to Hoskins personally because the prosecution would be introducing it in support of their case against him. In any case, it was not manifestly arbitrary, unreasonable, or unfair for the trial court to rely on the People's representations about its trial plans.