No. 110,513

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

VIRGINIA DICKERSON, as Lawful Heir of NICOLE DICKERSON,
*Appellant*,

v.

SAINT LUKE'S SOUTH HOSPITAL, INC., *et al.*,
*Appellees*.

SYLLABUS BY THE COURT

1.

The district court must give an instruction that a party requests if it is both legally and factually appropriate.

2.

Joinder is legally distinct from a request to compare the fault of a nonparty, and only joinder is a defendant-specific right. The language of the nonparty comparative-fault instruction—unlike the language of the comparative negligence joinder statute—does not indicate that it creates a right only for defendants.

3.

To promote judicial efficiency, courts should compare the fault of nonparties when the evidence requires it.

Appeal from Johnson District Court; JAMES CHARLES DROEGE, judge. Opinion filed April 3, 2015. Affirmed.

*James M. Crabtree*, of Crabtree Law Office, of Lenexa, for appellant.

*Adam S. Davis*, *Thomas W. Wagstaff*, *Brandon D. Henry*, and *Sarah S. Ruane*, of Wagstaff & Cartmell, LLP, of Kansas City, Missouri, for appellees.

Before GREEN, P.J., ARNOLD-BURGER, J., and BUKATY, S.J.

ARNOLD-BURGER, J.: This is an appeal from a wrongful-death jury trial in which the jury returned a verdict in favor of the defendants St. Luke's South Hospital, Inc. (St. Luke's), and two doctors. The jury determined that none of the defendants were at fault, and then it attributed 0% of the fault for Nicole Dickerson's death to each defendant. Virginia Dickerson, as lawful heir of Nicole Dickerson (the Estate), appeals this result because it requested that the court instruct the jury to compare the fault of three nonparty doctors along with the named defendants and to list these nonparty doctors' names on the verdict form, but the court refused. The Estate argues this was error because it was entitled to any instruction it had evidence to support, and it presented evidence of the fault of the nonparty doctors. The Estate contends that it is entitled to a new trial because, as a result of the error, the court asked the jury to attribute 100% of the fault to only 50% of the people accused of causing the harm. After a thorough review, we find that the district court erred by not instructing the court as the Estate requested, but the error did not prejudice the Estate's substantial rights or impact the trial's outcome. Adding additional nonparty defendants would not have changed the jury's conclusion that Nicole's death did not result from a medication error caused by the defendant hospital and doctors (and the actions of the hospital's nurses).

FACTUAL AND PROCEDURAL HISTORY

Nicole Dickerson suffered from velocardiofacial syndrome, a birth defect that caused a large hole in her heart. The condition resulted in blood transfer between the left and right sides of her heart and in the underdevelopment of the artery that pumped blood from the right side of Nicole's heart into her lungs for oxygen. Nicole underwent

2

numerous surgeries to have the hole in her heart plugged and the artery bypassed, but these surgeries did not cure her disease, and over the years Nicole developed severe pulmonary hypertension. This means that Nicole's body struggled to get blood to her lungs to get oxygen, which in turn depleted the amount of blood returning to her heart. A side effect of Nicole's condition was liver congestion, which caused fluid to accumulate in Nicole's abdomen.

At 24 years old, Nicole had run out of life-extending options and was living on hospice care, which meant her primary-care physician predicted she had as little as 3 to 6 months left to live. But Nicole's family testified at trial that she remained lively: She was studying at community college, living with her sister—LaTosha Duckworth (a nurse who helped care for Nicole), and preparing to go on vacation when the events that led to this litigation transpired.

On April 10, 2008, Nicole arrived at St. Luke's for an outpatient paracentesis. Nicole had elected to have the paracentesis—a palliative procedure whereby excess fluid is drained from the abdomen—before going on vacation.

In order to admit Nicole for her procedure, the admitting nurse, Chrisan Theobald, completed a medication-reconciliation form. Theobald testified that her job required her to get the patient's most recent medical records and record the medication doses the patient was prescribed so that the next nurse could double check those doses with the patient before having the doctor confirm them. Generally, Theobald said she tried to get records from as recently as 30 days before the patient came into the hospital, but in Nicole's case, she testified that she believed she had relied on hospital records from 5 months earlier, November 2007, to get a list of Nicole's medications. Theobald indicated that Nicole should receive 2.5 mg of Vasotec twice a day on her form. But Nicole's primary physician had lowered Nicole's dose of Vasotec to half that amount and

3

testified that she had been prescribing Nicole 1.25 mg of Vasotec in the months leading up to her death.

Mary Ann Lambers was the next nurse to speak directly with Nicole and her mother, Virginia Walker (a/k/a Virginia Dickerson), about Nicole's medication. Lambers' job required her to get an accurate account of the medications Nicole was taking as of the time she came in for her procedure and to add or subtract medications or change dosages from Theobald's form and enter the information into the computer system. Lambers testified that while she could not recall the details of her conversation with Nicole and Walker clearly, she knows that she spoke with them because on Theobald's handwritten medication-reconciliation form, some blanks are filled in by Lambers indicating Nicole's current doses of medications.

Walker says that she gave Lambers a container full of Nicole's medications with the accurate dosing information reflected on the pill bottles and that she also gave Lambers a list of Nicole's medications with the correct dosing information. Lambers says she never received any medication lists or pill bottles from Nicole or Walker because these items would have been entered into her notes and tagged for Nicole's file, but they were not. Lambers acknowledged, however, that Walker alleged a major error on Nicole's medication form: Lambers had said that Nicole should receive 2.5 mg of Vasotec twice a day, and Walker said that Nicole had only been taking 1.25 mg twice a day.

While undergoing the paracentesis, the doctors noticed that Nicole had cellulitis— a skin infection—in her leg, and they recommended she undergo a round of antibiotics to treat the condition. Nicole decided to stay overnight at the hospital to have the antibiotics administered intravenously.

Dr. Shelley Edwards was the hospitalist on duty when Nicole was admitted, and she treated Nicole only on Nicole's first night at St. Luke's. When Nicole arrived in

4

Edwards' unit, Nicole had very low blood pressure, with the systolic number at only 68 to 70. Because Nicole's condition seemed dire for a patient admitted into the internal-medicine unit, Edwards made a point to investigate Nicole's condition immediately. Edwards pulled Nicole's chart and learned about her heart disease, about the fact that she was on hospice care, how she had come in for palliative paracentesis, and about the cellulitis in her legs. Edwards said she focused primarily on Nicole's hospitalization in November 2007 to get a sense of what to expect when she visited Nicole. After a quick view of these records, Edwards said she went to see Nicole, who was with her mother.

Edwards described Nicole's appearance as something she had not seen before or since and said that Nicole looked like she was 25 going on 85 with incredible swelling in her abdomen, genitals, and legs because of her heart failure. Edwards said Nicole had gained 20 pounds of fluid since her last visit 5 months before. At Nicole's last visit, she could stand on her own, Edwards said, but when Edwards saw her she could not get out of a chair unless she was hoisted. Edwards also noted that she was dizzy, exhausted, depressed, tearful, and incontinent.

Edwards said Walker was very concerned that Nicole had not been given her medication and that Edwards had initially consented to giving it to Nicole—including the 2.5 mg dose of Vasotec—but then changed her mind when she saw the results from some lab tests she had ordered. The lab results showed Edwards that Nicole was experiencing acute renal failure, which Edwards believed would kill her. Accordingly, Edwards testified that she entered a hold order on all of Nicole's medications pending a cardiology consultation. In Edwards' notes on Nicole's chart, she mentioned that Nicole often presented with low blood pressure and that Nicole lived with low blood pressure according to Walker. Edwards nevertheless stressed that Nicole suffered from low blood pressure and kidney failure *before* any medications in any amount were given to her and that paracentesis could cause kidney failure.

5

Dr. Paul Chan consulted on Nicole's case at Edwards' request for a cardiologist. His nurse practitioner interviewed Nicole and Walker before he met with them, and, like the nurses before her, recorded that Nicole took 2.5 mg of Vasotec twice a day in her notes. Chan admitted he did not follow up on this dosing information and that he would not have knowingly doubled Nicole's dose of the medicine. Chan said, however, that Nicole's dose of the heart medication was so low that doubling it was not necessarily medically significant and stated that taking Nicole off the medication when her blood pressure began dropping might actually have caused her heart to fail more quickly.

Dr. Douglas Anderson took over as the third hospitalist on Nicole's case. Anderson believed he had ordered Nicole's medications in the dosages she had been taking before she had been hospitalized. He said that when he took over Nicole's care he looked at the notes on her chart. He admitted to approving the continuation of Nicole's Vasotec even as her blood pressure continued to drop, and he admitted that low blood pressure could be a side effect of Vasotec, though he cautioned that Nicole took such a low dose of Vasotec that it would not have a negative impact on most patients, as some patients took as much as 40 mg per day and she took only 5 mg. Anderson admitted that he had looked at the cardiologists' notes and that in a handwritten note given to him at trial Nicole's dose appeared to be only 2.5 mg *once* a day. But Anderson said he had not seen the handwritten note while he had been treating Nicole and that the typed notes said she should be given 2.5 mg of Vasotec twice a day. Anderson said that while Vasotec could cause kidney failure and low blood pressure, it was unlikely in the amount given to Nicole.

Dr. Teresa Tovrea treated Nicole for the last 4 days she stayed at St. Luke's until her transfer to another hospital. Tovrea said when she came on shift, she reviewed all of Nicole's records and then went to check on her. To her, Nicole looked very ill—swollen, unable to get out of bed even to use the restroom, her legs were weeping, and the skin on her legs was starting to slough from the swelling. Tovrea said she was so concerned about

6

Nicole's condition that she called Dr. Martin Zink—a cardiologist—to ask what options there were for Nicole who was now in end-stage heart failure and acute renal failure. He ordered Dobutamine, a heart medication, and they moved Nicole to the intensive-care unit (ICU). Tovrea thought Nicole's outlook was very grim.

Zink treated Nicole when called in by Tovrea; he had been her doctor in November 2007, the last time Nicole had been at St. Luke's. He noted that Nicole's condition had deteriorated in the past 5 months since he had last seen her—her legs were very swollen, for example. In November 2007, he had prescribed 2.5 mg Vasotec twice daily to Nicole, and he said this is what he believed she had been taking from then until he saw her in April. He agreed that if she had been taking a lower dose, he should have known about it. But he did not believe that changing Nicole's Vasotec dosage impacted her condition because the dosage amounts were so low and her renal failure was acute. He thought giving Nicole the amount of Vasotec that he approved was appropriate under the circumstances.

After moving to the ICU, Tovrea said Nicole's vital signs continued to deteriorate and multiple organ systems began to fail. Walker and Duckworth said that they wanted all life-saving measures to be taken, and the specialists were saying nothing could be done to cure Nicole's conditions. Ultimately, Tovrea said she transferred Nicole to a branch of St. Luke's on the Plaza (the Plaza) on April 16, 2008, after the team of doctors had concluded her liver, lungs, heart, and kidneys were failing, and Chan had suggested the Plaza might be able to perform ultrafiltration. Tovrea said that she had given Nicole 2.5 mg of Vasotec twice a day and that she thought this was appropriate because of Nicole's condition—even if it had not been the dose she had been on at home. Further, even if it was an error, Tovrea said that it was the cardiologists' job to prescribe medications specific to their specialty. Tovrea also said that transferring Nicole earlier would not have changed the outcome of Nicole's care.

At the Plaza hospital, Nicole died. Walker instituted this wrongful death action on behalf of the Estate against St. Luke's for the actions of its nurses, specifically Lambers and Theobald, as well as against doctors Edwards, Anderson, and Tovrea.

Before trial, the Estate dropped Anderson as a party to the suit. Notably, the Estate did not sue Chan or Zink. In the pretrial order, the Estate asserted that the joint negligence of the nurses (acting on behalf of St. Luke's) and the named doctors had caused Nicole's death in that they had given her double the dosage of Vasotec from what she was used to, which had caused her blood pressure to drop and her kidneys to fail and had led to her death. Conversely, the defendants argued that they had not caused Nicole's death. But the *defendants* asserted that if the Estate was able to reach the jury on the issue of their fault, then the jury "must also consider the comparative fault of all defendants against whom this suit was initially brought and any non-parties against whom there is evidence of negligence."

Accordingly, the pretrial order noted that the comparative fault of any party or nonparty was an issue of fact to be determined by the jury and a disputed issue of law to be resolved by the court. Both parties and the court approved the pretrial order containing this language.

At trial, both parties advanced theories consistent with the pretrial order. The Estate's expert, Dr. Herbert J. Stern, opined that all of the doctors and nurses involved in Nicole's care—specifically nurses Lambers and Theobald and doctors Anderson, Chan, Edwards, Tovrea, and Zink—deviated from the standard of care that Nicole had a right to expect by doubling her dose of Vasotec, not noticing or correcting this error, not withdrawing the Vasotec when Nicole's blood pressure fell and her kidneys failed, by continuing to prescribe the Vasotec, by incorrectly transcribing the family's statements about Nicole's prescriptions, and by not transferring her to the Plaza sooner for potentially life-saving treatment. Specifically, Stern said that giving Nicole double the

8

dose of Vasotec that she had been used to led to the drop in her blood pressure, which caused her acute kidney failure that caused her death. Stern noted that the number one reason that people die in hospitals when they should not die is because of medication errors. Yet Stern did admit that paracentesis can cause kidney failure, that Nicole was in "some degree" of kidney failure before she had been given any amount of Vasotec, and that the kidney specialists considered that "degree" to be acute.

Conversely, the defendants' expert, Dr. Joseph Billadello, testified that paracentesis causes blood pressure to drop. He said this happens because the procedure egresses fluid from the body and the vessels and causes recoagulation as the fluid is drained. According to Billadello, nothing that happened to Nicole—including her death—could be attributed to the small increase in Vasotec. Billadello told the court that Nicole died because she suffered from heart failure.

At the close of evidence and outside of the jury's presence, the court reviewed its proposed instructions with the parties. Before trial, the Estate had proposed a jury instruction comparing the fault of nonparties to the action, specifically Anderson, Chan, and Zink. The Estate wanted to instruct the jury that it could compare the fault of these nonparties and to name these nonparties as potential wrongdoers on the verdict form. The court's proposed instruction No. 10 did not compare the fault of these nonparty doctors; and the Estate objected, pointing out that evidence of the negligence of nonparties existed in this case. The court responded that it understood but that it would not compare the fault of nonparties.

When the court asked the parties if they objected to the verdict form, the Estate's attorney again objected, stating:

"Judge, I would renew my objection about the comparative fault of the parties. I think there is evidence of comparative fault of more than the parties in this case, and that

9

we've asked that their fault be compared and the Court has ruled it won't be compared. So I can submit an instruction with other parties in there. I've got a verdict form that is not perfect, but I'll submit it . . . ."

The defense argued that the Estate should not be allowed to elect whose fault to compare because it could have sued other parties if it wanted to and it did not sue the nonparties that it now wanted named to compare their fault. According to the defense, comparative fault is an affirmative defense only and, therefore, only defendants can force the court to compare the fault of nonparties.

The court ultimately concluded that the evidence focused on the people named in the lawsuit—St. Luke's, Edwards, and Tovrea—and declined to list nonparties on the verdict form.

When the jury returned, the court read the instructions. The court instructed the jury that as to fault:

"1. Your first obligation is to determine if any defendant is at fault.
"2. If you decide that any defendant is at fault, you must then assign a percentage of fault to each defendant you find to be at fault.
"3. For a defendant not at fault, show 0% on the verdict form.
"4. If you find any defendant at fault, show 1% to 100% on the verdict form for that defendant.
"5. If one or more defendants are assigned fault, the total of all fault must be 100%."

The jury was also instructed that it could only assign fault to St. Luke's, Tovrea, and Edwards.

In closing arguments, the defendants posed a hypothetical question: "Just what exactly is negligence?" First, the defendants' attorney gave the legal standard—if the

10

doctors' performance deviated from the standard of care expected by professionals in the same field and community under the same circumstances then they were negligent. Then, the defense explained that

> "Doctor Cox and Dr. Anderson and Dr. Edwards and Doctor Tovrea are all members of the same profession and you heard about all of them and the—so if these two doctors [Edwards and Tovrea] did the—operated the same way as the other two whose care was not called into question, then they weren't negligent. In fact, that's exactly what they did."

But the Estate's attorney had the chance to rebut this argument, and he noted:

> "You know, Mr. Wagstaff addressed Dr. Edwards, Doctor Anderson, Dr. Cox and Dr. Tovrea and what I know is it is not appropriate for you to speculate about why Doctor Anderson and Dr. Cox are not here, but I'll tell you this, nowhere in the instructions from the Court are you going to find anything that says there is any standard other than what we've addressed here and what is in the instructions.
>
> "What happened with—I guess what I am saying and what happened with Anderson and Cox and why they are not here is completely irrelevant to your decision and needs to be so. So here's the deal: There is some evidence in this case of negligence by people that aren't here, but your instructions from the Court are very clear and you're not to speculate about those [people]. But here's what we know: Did you find any party to be at fault? And the parties we're talking about here are Saint Luke's South and there is the instruction that says Saint Luke's South, everyone understands they're responsible for the nurses [and doctors Edwards and Tovrea]."

After deliberating and posing no questions to the court, the jury returned a verdict in favor of the defendants. It attributed 0% of the fault to each listed defendant.

The Estate moved for a new trial on the grounds that the district court should have instructed the jury to compare the fault of nonparties and should have listed the names of the nonparties it had requested on the verdict form. The district court denied the Estate's

11

motion for a new trial. The Estate appealed the denial of its motion and the outcome of the trial.

ANALYSIS

*While the Jury Should Have Been Instructed to Compare the Fault of the Nonparty Doctors, the Estate Fails to Show the Requisite Prejudice for Reversal.*

The Estate argues that the district court erred by not instructing the jury that it could compare the fault of people who were not parties to the lawsuit and by not giving the jury the opportunity to apportion fault to nonparties on the verdict form. Specifically, the Estate contends it put forth evidence of the wrongdoing of three additional doctors—Anderson, Chan, and Zink. The Estate complains that it was logically inconsistent to tell the jury that it had to attribute 100% of the fault to the named defendants, when evidence showed that other individuals' actions also contributed to Nicole's death.

Conversely, the defendants ask this court to uphold the district court's decision to not give the instruction because they argue that (1) the instruction was not meant to be used by plaintiffs who have control over the parties involved in litigation; and (2) even if a plaintiff can legally request the instruction, the district court's failure to give it here did not harm the Estate.

To determine if the district court erred by not instructing the jury on the comparative fault of nonparties Anderson, Chan, and Zink, this court employs a multi-step analysis. See *Foster v. Klaumann*, 296 Kan. 295, 301, 294 P.3d 223 (2013). First, it exercises unlimited review over questions of appellate jurisdiction and issue preservation. Second, this court exercises unlimited review to determine whether the requested instruction was legally appropriate. Third, if this court finds the instruction was legally appropriate, it looks at the record in the light most favorable to the requesting party to

12

determine whether sufficient evidence would have supported giving the instruction. If the instruction would have been legally appropriate and it was factually supported by sufficient evidence, then the district court erred, and this court moves to the final step of the analysis. Under the fourth and final step, this court examines the error to determine if it is harmless. 296 Kan. at 301-02; see K.S.A. 2014 Supp. 60-261.

1. *The Estate Preserved This Claim for Appellate Review.*

First, this court must ensure that the Estate preserved its claim that the district court erred by not instructing on the comparative fault of nonparties for this court's review. See *Foster*, 296 Kan. at 301. A party preserves a claim that the district court erred by not giving a requested instruction for review on appeal by requesting the instruction at trial, objecting at trial to the court's refusal to give the instruction, and by giving the trial court grounds for the objection. See K.S.A. 2014 Supp. 60-251(c)(1), (c)(2)(A), and (d)(1)(B).

This court may review the Estate's claim because it requested a nonparty comparative-fault instruction and objected to the court's decision to not give it. The Estate proposed a jury instruction and a jury-verdict form that compared the fault of Anderson, Chan, and Zink in addition to the fault of the named defendants. Further, when the court discussed the jury instructions with the parties and told them it did not intend to give an instruction on the fault of nonparties, the Estate objected. Again, when the court showed its proposed verdict form to the parties and it did not include the names of the nonparties that the Estate alleged had been at fault, the Estate again objected. Accordingly, the Estate preserved this claim of error for appellate review.

13

## 2. *A Nonparty Comparative-Fault Instruction Was Legally Appropriate.*

Second, this court must determine if it would have been legally appropriate for the district court to instruct the jury on the comparative fault of the nonparty doctors. See *Foster*, 296 Kan. at 301. To be legally appropriate, the requested instruction must fairly and accurately state the *applicable* law when viewed in isolation and it must be supported by the particular facts of the case. *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012). Specifically, then, this court must decide if the Estate's requested instruction correctly stated the law and if it applied in the Estate's case against Nicole's doctors and St. Luke's.

Here, the Estate's requested instruction correctly stated the law. In fact, the Estate requested an instruction identical to the instruction given by the court, except the Estate's requested instruction listed Anderson, Chan, and Zink as additional persons to which the jury could assign fault. Both the instruction the Estate requested and the instruction the court gave mirrored the Kansas pattern instruction for explaining the verdict in a comparative-fault case, PIK Civ. 4th 105.03. But see PIK Civ. 4th 105.04 (comparative fault—where claim made against one not joined as party, *i.e.*, a nonparty).

While district courts are not required to use Kansas' pattern instructions, the instructions are strongly recommended because they have been designed by a knowledgeable committee that aimed to bring accuracy and clarity to jury instructions. *Hibbert v. Randsell*, 29 Kan. App. 2d 328, 331-32, 26 P.3d 721 (applying discussion of criminal pattern instructions to civil instructions), *rev. denied* 272 Kan. 1417 (2001); see *State v. Dixon*, 289 Kan. 46, Syl. ¶ 10, 209 P.3d 675 (2009). Though the Kansas Supreme Court has acknowledged that courts should not hesitate to modify or add to the pattern instructions if the facts of a particular case require modification, it has also clarified that without a particular need to modify an instruction, courts should follow the recommended wording. *Hibbert*, 29 Kan. App. 2d at 331-32; see *State v. Dominguez*, 299 Kan. 567,

14

576, 328 P.3d 1094 (2014); *Dixon*, 289 Kan. 46, Syl. ¶ 10. The Estate therefore accurately stated the law of comparative fault in its proposed instruction.

But the parties strongly disagree over whether the Estate's instruction would have been appropriate or applicable in this case. The Estate contends the district court was obligated to give the instruction requested. The Estate maintains that Kansas law *requires* courts to give nonparty comparative-fault instructions when *any* party requests it and the court has evidence of the nonparties' fault. Conversely, the doctors and St. Luke's argue that a plaintiff in the lawsuit may *never* request that the court compare the fault of nonparties because the comparative-fault statute was designed to benefit defendants.

On this point, we agree with the Estate. The district court must give an instruction that a party requests if sufficient evidence supports giving it. *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, Syl. ¶ 1, 228 P.3d 1048 (2010); *Wright v. Sourk*, 45 Kan. App. 2d 860, 872-73, 258 P.3d 981 (2011), *rev. denied* 293 Kan. 1114 (2012). Although the defendants point out that the Estate did not cite to a single case where a plaintiff requested that the fault of a nonparty be compared in the jury instructions or on a verdict form and our research did not uncover such a case in Kansas, the lack of caselaw illustrating the plaintiff's position is understandable. It makes sense because adding nonparties to a verdict form does not financially benefit a plaintiff; it can only decrease and never increase the amount of damages a plaintiff may recover from parties to a lawsuit. This is because comparing the fault of a nonparty with the fault of the parties only reduces the amount of fault potentially attributable to the defendant or defendants. *Ellis v. Union Pacific R.R. Co.*, 231 Kan. 182, 189, 643 P.2d 158, *aff'd on reh.* 232 Kan. 194, 653 P.2d 816 (1982). It does not permit the plaintiff to recover from the nonparties or otherwise increase the recovery available to the plaintiff. 231 Kan. at 189. Thus, the fact that other plaintiffs have not appealed on this issue is not relevant to our determination here.

15

Moreover, the defendants' argument that *only* defendants can request the instruction is based entirely off the comparative-fault statute, not the comparative-fault jury instruction. Specifically, the defendants' note that Kansas courts have clarified that the comparative-fault/negligence statute, K.S.A. 2014 Supp. 60-258a(c), confers rights on any party *against whom a claim is asserted*, *i.e.*, a defendant, to join additional negligent parties. See *McGraw v. Sanders Co. Plumbing & Heating, Inc.*, 233 Kan. 766, 772, 667 P.2d 289 (1983); *Brown v. Keill*, 224 Kan. 195, 203-07, 580 P.2d 867 (1978).

But, this is not a case of joinder. The statute's plain language permits defendants—and only defendants or third-party defendants—to add parties to lawsuits when they argue that the additional parties are partially responsible for the harm they allegedly caused. See K.S.A. 2014 Supp. 60-258a(c). This joinder statute exclusively deals with a defendant's right to join a party to the lawsuit. But there is a logical reason for this specific language:  A plaintiff could have joined the additional parties it considered to be at fault by simply naming them as defendants in the original action, and defendants could not. The legislature therefore had to create the right of defendants to bring in additional parties separately, which it did in K.S.A. 2014 Supp. 60-258a(c). See also *Haley v. Brown*, 36 Kan. App. 2d 432, 437, 140 P.3d 1051 (2006) ("The comparative fault statutory scheme is simple. The plaintiff can choose the parties [the plaintiff] wishes to sue, and the defendants can bring in others if they are considered to be at fault.").

But as Kansas caselaw has long noted, joinder is legally distinct from a request to compare the fault of a nonparty, and only joinder is a defendant-specific right. See *Brown*, 224 Kan. at 205-07 (noting that formal joinder is not a necessary prerequisite for comparing the fault of an entity or individual); *Haley*, 36 Kan. App. 2d at 436-37. Conversely, the language of the nonparty comparative-fault instruction—unlike the language of the comparative negligence joinder statute—does not indicate that it creates a right only for defendants. Compare PIK Civ. 4th 105.04 with K.S.A. 2014 Supp. 60-258a(c).

16

In fact, the comments to the pattern instructions clearly note that the instruction should be given *whenever* there is evidence of fault of a nonparty: "Where the evidence warrants it, the court *must* add that person . . . solely for the purpose of determining and allocating fault upon a one hundred percent basis [by] including [that] person[] in the special verdict form." (Emphasis added.) PIK Civ. 4th 105.04, Comment; see also *Greenwood v. McDonough Power Equipment, Inc.*, 437 F. Supp. 707, 712 (D. Kan. 1977) (discussing earlier version of nonparty comparative-fault instruction). The comments to PIK Civ. 4th 105.04 likewise do not discriminate against which party may request the instruction but note instead that "[*a*] party to the action may claim that . . . persons other than parties to the action caused or contributed to the injury and damage claimed." (Emphasis added.) The use of the word "a" is relevant because it does not say that the *defense* may make a claim against an individual who is not a party to the lawsuit and then request the individual's fault be compared but that "a" party may do this, as in *any* party to the action may do this, including the plaintiff. See PIK Civ. 4th 105.04, Comment.

Though the giving of the pattern instructions is of course not mandatory and the comments to the pattern instructions are not binding on this court, it is important to note that a knowledgeable committee who aspired to bring clarity and accuracy to jury instructions wrote the instructions, as well as the comments to the instructions. *Hibbert*, 29 Kan. App. 2d at 331-32. Moreover, the pattern instructions should be the starting point in the preparation of any set of jury instructions. 29 Kan. App. 2d at 331. Further, the notion that any party should be able to request to compare the fault of nonparties is supported by caselaw, which states that to promote judicial efficiency courts should compare the fault of nonparties when the evidence requires it. *Gaulden v. Burlington Northern, Inc.*, 232 Kan. 205, 213, 654 P.2d 383 (1982) ("We have consistently held that all issues of liability, including the causal negligence or fault of all parties to an occurrence, should be determined in one lawsuit, whether the participants are all formally joined as parties to that lawsuit or not."). And there is certainly nothing cited by the defendants to undermine the principle of law with which this discussion began: A trial

17

court must give an instruction requested by a party if sufficient evidence supports it. *Puckett*, 290 Kan. 406, Syl. ¶ 1.

So, while it is hard to imagine many plaintiffs making the unusual and financially risky request to compare the fault of additional nonparty entities in jury trials, the defendants' argument that Kansas law precludes them from doing so must fail. On the contrary, regardless of whether the plaintiff or the defendant requests the instruction, district courts should take into consideration all potential tortfeasors against whom evidence exists—parties or not—and allow the jury to apportion fault amongst them. In sum, then, the requested instruction was an accurate statement of applicable law under the test's second step.

### 3. *Evidence Supported Instructing the Jury on the Nonparty Doctors' Fault.*

Under the third step, this court determines whether sufficient evidence supported comparing the fault of the nonparty doctors to the fault of the named defendants. See *Foster*, 296 Kan. at 301. Sufficient evidence in this context is evidence that, when viewed in the light most favorable to the Estate, would allow reasonable minds to reach different conclusions based on the theory the Estate wished to advance through the requested instruction. See *Puckett*, 290 Kan. at 419. In other words, if reasonable people could disagree over whether Anderson, Chan, and Zink were negligent in caring for Nicole based on the evidence presented at trial, then the district court should have instructed the jury to compare their relative fault.

The district court ruled that sufficient evidence did not support giving this instruction, but we disagree. Sufficient evidence existed to allow the jury to compare the fault of Anderson, Chan, and Zink. All three of these doctors—like the doctors named in the litigation—admitted to prescribing or continuing Nicole's Vasotec under the mistaken belief that she had been on 2.5 mg twice a day before coming to the hospital; and all three

18

doctors said they did not stop giving it to her when her blood pressure dropped, despite knowing that it could cause low blood pressure.

Further, the Estate's expert, Dr. Stern, testified that the nonparty doctors were at fault in causing Nicole's death. He said that Anderson deviated from the standard of care by continuing Nicole's Vasotec even when her blood pressure numbers were very low. Further, multiple witnesses opined that it would have been the job of the cardiologists treating Nicole—Chan and Zink—to control Nicole's Vasotec because the hospitalists were obligated to defer to them when it came to medications prescribed under the cardiology specialty, like Vasotec was.

In light of the fact that the Estate's expert testified that Nicole died because of a Vasotec error, which caused low blood pressure, her kidney failure, and her subsequent death, a reasonable jury could have concluded Anderson, Chan, and Zink were each partially causally responsible for Nicole's death had the verdict form and instructions allowed for it to do so. Sufficient evidence therefore supported the Estate's request to compare the fault of the nonparty doctors, and the district court erred by not instructing the jury that it could compare the fault of the nonparty doctors, with the fault of the named parties and by not including their names on the verdict form. But not every error requires reversal, so this court must turn to the final step of the instructional-error analysis. See K.S.A. 2014 Supp. 60-261; *Foster*, 296 Kan. at 301-02.

### 4.  *The Error Was Harmless.*

Fourth, this court determines whether the district court's error requires this court to reverse the district court's decision or whether the error was harmless in light of the entire record. See *Foster*, 296 Kan. at 301-02. An error is harmless if it did not affect a party's substantial rights and if a trial's outcome would have been the same even if the error had not occurred. See K.S.A. 2014 Supp. 60-261; *State v. Ward*, 292 Kan. 541, 565, 256 P.3d

19

801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). The degree of certainty by which the court must be persuaded that the error did not affect the outcome of the trial will vary depending on whether the error implicates a constitutional right. 292 Kan. at 565. Because the Estate does not allege the violation of a constitutional right, this court must be persuaded that there is no reasonable probability that the error affected the trial's outcome or it must reverse the district court's decision. See 292 Kan. at 565; see also *Critchfield Physical Therapy v. The Taranto Group, Inc.*, 293 Kan. 285, 310-11, 263 P.3d 767 (2011) (applying *Ward* nonconstitutional harmless-error test in civil context).

Here, the Estate argues that failing to give the instruction changed the trial's outcome because it asked the jury to do something logically inconsistent:  namely, to attribute 100% of the fault to only half of the people allegedly at fault. Conversely, the defendants note that the jury expressed no confusion over its task and still attributed no fault to any defendant listed. Adding nonparties for the comparison of fault, the defendants contend, does not lead to the conclusion that a jury would increase the amount of fault attributed to the already named parties.

Here, we agree with the defendants. Had the jury attributed *any* fault to the defendants, the error might well have been reversible because this court would be forced to agree that the jury attributed 100% of the fault to less than 100% of those who caused the harm. But to be clear, such an error would have benefitted the Estate because more fault would have been assigned to the parties that the Estate could recover from. Here, however, the jury found the existing named parties were not at fault. These parties would still be 0% at fault no matter how many more nonparties were added:  0 divided by 3 is 0 as 0 divided by 6 is 0.

Further, under the instructions, the jury's first duty was to determine if the defendants were at all at fault, and it determined they were not. Once it made this determination, the list of names that it could attribute fault to in the second step was

20

immaterial. Since the jury decided the defendants did not cause Nicole to die, it did not matter what names were listed on the verdict form because apportionment of fault always comes after determination of fault. A different list of names could not change the determination of fault, only the apportionment of fault. But it is the determination of fault that the Estate is complaining about. On the verdict form, the Estate is alleging an error to question 2, but it loses its case under question 1.

Moreover, that the jury determined the named defendants were not at fault indicates that the jury believed the defendants' theory of the case—Nicole did not die because of a Vasotec error. Consequently, adding more nonparties and alleging the same theory would not have caused the jury to attribute fault to the named parties but to find that even more people played no role in causing Nicole's death.

Accordingly, while the district court should have instructed the jury to compare the fault of the nonparty doctors, this error did not impact the trial's outcome. The district court's judgment is affirmed.

Affirmed.