2012 CO 74

**In re Stacy WARDEN and Chris Warden individually and as natural parents, guardians and legal representatives of Noah Warden, a minor child, Plaintiffs**

v.

**EXEMPLA, INC., d/b/a Exempla Healthcare; Exempla Good Samaritan Medical Center, L.L.C.; Camille S. Calderwood, M.D.; Jennifer Dillon, R.N.; and Jessica Jenks, R.N., Defendants.**

No. 12SA199.

Supreme Court of Colorado,
En Banc.

Dec. 20, 2012.

Cummins & Krulewitch, Beth L. Krulewitch, Aspen, Colorado, Daniel P. Gerash, Eric L. Steiner, Denver, Colorado, Attorneys for Plaintiffs.

Kennedy Childs P.C., Catherine O'Brien Crum, Terry Cipoletti, Denver, Colorado, Attorneys for Defendants Exempla, Inc., Exempla Good Samaritan Medical Center, L.L.C., and Jessica Jenks, R.N.

Martin Conklin, P.C., John L. Conklin, Amy K. Cardone, Denver, Colorado, Pryor Johnson Carney Karr Nixon, P.C., Elizabeth C. Moran, Greenwood Village, Colorado, Attorneys for Defendant Camille S. Calderwood, M.D.

Wheeler Trigg O'Donnell LLP, Kevin J. Kuhn, Michiko A. Brown, Katherine C. Yarger, Denver, Colorado, Attorneys for Defendant Jennifer Dillon, R.N.

Justice RICE delivered the Opinion of the Court.

¶ 1 In this original C.A.R. 21 proceeding, we review the trial court's order striking the testimony of plaintiff's rebuttal expert witness, Dr. Susan Shott. We also consider the trial court's order striking portions of the testimony of two previously disclosed expert witnesses, Dr. Harriet T. Cokely and Dr. Pamela E. Wilson. We hold that the trial court abused its·discretion when it excluded Dr. Shott's rebuttal testimony because her testimony properly refuted a central theory of the defendants' case. The trial court also abused its discretion when it excluded Dr. Cokely's and Dr. Wilson's testimony because the late disclosure of their testimony did not harm the defendants, as required for sanctions under Rule 37. Accordingly, we make the rule absolute and remand for further proceedings consistent with this opinion.

## I. Facts

¶ 2 On May 12, 2010, Noah Warden, a minor, and his parents, Stacy Warden and Chris Warden (collectively the "Wardens"), brought medical malpractice claims against Defendants, Exempla, Inc., Exempla Good Samaritan Center, L.L.C., Dr. Camille S. Calderwood, Nurse Jennifer Dillon, and Nurse Jessica Jenks, (collectively, "Exempla"), for alleged breaches of the standards of medical care resulting in extensive injuries to Noah during his birth.

¶ 3 The Wardens allege that on December 22, 2008, Stacy Warden arrived at Exempla Good Samaritan Medical Center. After nine hours of labor, her son Noah was delivered by emergency cesarean section. At birth, Noah's umbilical cord was wrapped around his neck, he was unresponsive, and had no heartbeat. After several minutes of resuscitation efforts, Exempla personnel restored Noah's heartbeat and placed him on a ventilator.

¶ 4 The Wardens also argue that an MRI of Noah's brain revealed that he suffered from severe acute hypoxic-ischemic encephalophy ("HIE"), the extensive death of brain matter resulting from oxygen deprivation. Now three years old, Noah cannot communicate or walk and requires round-the-clock care.

¶ 5 The parties dispute the cause of Noah's injuries. The Wardens maintain that Noah was injured by a preventable intrapartum event: Exempla's failure to properly monitor data generated by the fetal monitoring strip during Noah's birth. With proper monitoring, the Wardens' contend, defendant Dr. Calderwood could have timely diagnosed fetal distress and performed an earlier caesarean section.

¶ 6 Exempla argues that Noah's injuries occurred days, or possibly weeks, before his birth. Exempla relies on the analysis of a placental pathologist, Dr. Weslie Tyson, who examined Noah's umbilical cord shortly after birth and allegedly found significant abnormalities—including muscle death of the umbilical vein wall, clotting of the umbilical vein, and poor blood supply through the umbilical cord—all suggesting Noah's injuries preceded labor.

¶ 7 The Wardens' petition addresses a discrete portion of this negligence action: the trial court's exclusion of certain expert testimony after the Wardens' rebuttal expert disclosures. We now describe the expert disclosures and the trial court's order striking a portion of the Wardens' expert disclosures.

## II. Procedural History

¶ 8 On June 28, 2011, the Wardens made their initial expert disclosures pursuant to Rule 26(a)(2) and the trial court's case management order. The Wardens included Dr. Cokely and Dr. Wilson among the eight testifying experts. Dr. Cokely opined that the doctors and nurses charged with Noah's care could have prevented Noah's injures had they properly monitored his fetal monitoring strip. Dr. Wilson's expert opinion concerned the expensive rehabilitative care Noah requires.

¶ 9 The Wardens also included in their initial disclosures the financial analysis of Jeffrey Opp estimating Stacy and Chris Wardens' expected costs in light of Noah's condition. Opp's estimate assumed Noah would live for over 70 years, as specified by statute.[1] He did not consider the effect of Noah's medical condition on Noah's life expectancy.

¶ 10 After deposing the Wardens' experts, Exempla disclosed its own experts in the fields of obstetrics, gynecology, maternal-fetal medicine, pathology, pediatric neurology, neonatology, pediatric neuroradiology, nursing, genetics, and damages. Among other things, Exempla's experts opined that Noah's condition at birth was not the consequence of intrapartum events. Exempla's experts' conclusions rested, in large part, on a 2003 American College of Obstetricians and Gynecologists study titled, "Neonatal Encephalopathy and Cerebral Palsy: Defining the Pathogenesis and Pathophysiology" ("NEACP"). The NEACP report outlines four essential criteria for finding that HIE was caused by intrapartum events. Exempla's experts concluded that Noah's umbilical cord gas values—a NEACP criterion—belied the Wardens' allegations that Noah's injuries occurred during labor. Exempla also disclosed two experts who expected to testify to Noah's shortened life expectancy.

¶ 11 On October 17, 2011, the Wardens disclosed four new rebuttal experts, including Dr. Shott, a biostatistician. Dr. Shott's testimony varied from the Wardens' initial expert disclosures because—rather than attacking the accuracy of Noah's umbilical cord gas test results—Dr. Shott's testimony questioned the validity of the NEACP criteria, concluding that the report was "junk science." In particular, Dr. Shott reviewed all 72 articles cited by the NEACP report and determined that the NEACP report did not rely upon "properly performed studies"; rather, Dr. Shott described the NEACP criteria as a set of "arbitrary cutoff values" based on a statistically insignificant sample size.

¶ 12 In addition to Dr. Shott's testimony questioning the NEACP report, the Wardens' rebuttal disclosures included expanding Dr. Cokely's and Dr. Wilson's testimony to address Noah's life expectancy. These two previously disclosed experts now anticipated testifying that Noah would probably live into his forties.

¶ 13 Exempla filed a motion to strike the Wardens' rebuttal disclosures, including the life expectancy opinions of Dr. Cokely and Dr. Wilson. They also filed a motion in limine to exclude the testimony of the Wardens' rebuttal expert, Dr. Shott. On April 3, 2012, after multiple hearings, the Magistrate issued an order pursuant to Rule 37(c)(1) striking the life expectancy opinions of Dr. Cokely and Dr. Wilson, and striking Dr. Shott as a rebuttal witness.

¶ 14 The Wardens moved for an expedited review of the Magistrate's order in Boulder County District Court ("trial court"). On May 7, 2012, the trial court affirmed the Magistrate's order. It agreed with the Magistrate that Dr. Shott's rebuttal testimony was "unresponsive [and not] dependent on any particular opinions expressed by [Exempla's] experts." For Dr. Wilson and Dr. Cokely, the trial court reasoned that the rebuttal testimony concerning Noah's life expectancy amounted to an "ambush" and was therefore improper rebuttal disclosure.

---

1. *See* § 13–25–102, C.R.S. (2012) (providing that "when it is necessary to establish the expectancy of continued life of any person from any period of such person's life, whether he is living at the time or not, the table set out in section 13–25– 103 shall be received as evidence, together with other evidence as to health, constitution, habits, and occupation of such persons of such expectancy"); *see also* § 13–25–103, C.R.S. (2012) (mortality table).

¶ 15 The Wardens now petition this Court under C.A.R. 21 for a review of the trial court's order limiting Dr. Cokely's and Dr. Wilson's testimony and striking Dr. Shott's testimony regarding the NEACP report. We hold that Dr. Shott's testimony was a proper rebuttal disclosure because it rebutted a specific, important portion of Exempla's expert disclosures. Dr. Cokely's and Dr. Wilson's testimony should also be admitted because its late disclosure did not harm Exempla. Therefore, we vacate the trial court's order striking the testimony at issue, make the rule absolute, and direct the trial court to conduct further proceedings consistent with this opinion.

### III. Original Jurisdiction

¶ 16 This Court exercises its original jurisdiction under C.A.R. 21 to review whether a trial court abused its discretion in situations where the normal appellate process would prove inadequate. *People v. Vlassis*, 247 P.3d 196, 197 (Colo.2011). A trial court's discovery ruling is interlocutory in character and generally not reviewable under C.A.R. 21. *In re Marriage of Wiggins*, 2012 CO 44, ¶ 12, 279 P.3d 1, 5 (2012). Exercise of our jurisdiction, however, is warranted in this case because the trial court's erroneous discovery sanctions significantly hinder the Wardens' ability to prove the merits of their negligence claim. *See Todd v. Bear Valley Vill. Apartments*, 980 P.2d 973, 977 (Colo. 1999) ("Issuance of pretrial orders that significantly disadvantage claimants in litigating the merits of a controversy are grounds for granting jurisdiction in an original proceeding." (citation omitted)); *see also Berry v. Keltner*, 208 P.3d 247, 249 (Colo.2009) (Exercising C.A.R. 21 jurisdiction because "[t]he trial court's order precluding [the expert's] testimony thus has the potential to substantially limit Plaintiff's ability to recover for her injuries.").

### IV. Standard of Review

¶ 17 "We review a trial court's imposition of sanctions under [Rule] 37 for an abuse of discretion." *Pinkstaff v. Black & Decker (U.S.) Inc.*, 211 P.3d 698, 702 (Colo. 2009) (citation omitted). "A trial court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair." *Id.* (citation omitted).

### V. Analysis

¶ 18 The trial court abused its discretion when it excluded Dr. Shott's testimony because her testimony properly rebutted Exempla's experts' conclusions regarding the cause of Noah's injuries. It also abused its discretion when it struck Dr. Cokely's and Dr. Wilson's testimony regarding Noah's life expectancy because any delay in disclosing the testimony of these expert witnesses was harmless. We address the trial court's errors separately, beginning with Dr. Shott and the proper scope of rebuttal disclosures under Rule 26(a)(2)(C)(III).

### A. Dr. Shott

¶ 19 The trial court erred when it excluded Dr. Shott's testimony because her testimony specifically refuted the defense's experts' theory of causation and therefore constituted a proper rebuttal disclosure under Rule 26(a)(2)(C)(III).[2] Rule 26(a)(2)(C)(III) provides the timing of expert witness disclosures "intended to contradict or rebut evidence on the same subject matter identified by another party [in a prior disclosure]." This case presents the Court with its first occasion to address the proper scope of rebuttal disclosures under Rule 26(a)(2)(C)(III).

¶ 20 As a starting point, we note that discovery is designed to facilitate "a fair trial [through] the parties' production of all relevant evidence." *Trattler v. Citron*, 182 P.3d 674, 679 (Colo.2008) (citations omitted). We also recognize that "the scope of discovery is 'very broad,' and the information sought 'need only be relevant to the subject matter' of the litigation." *Leaffer v. Zarlengo*, 44 P.3d 1072, 1083 (Colo.2002) (quoting *Kerwin v. Dist. Court*, 649 P.2d 1086, 1088 (Colo.1982)).

¶ 21 Consistent with these general discovery principles, we determine the proper

---

2. Dr. Shott's testimony was timely disclosed.

scope of rebuttal expert disclosures, in part, by considering the scope of admissible rebuttal evidence. *See Williams v. Dist. Court,* 866 P.2d 908, 910–11 (Colo.1993) (evaluating a Colorado Rule of Evidence to resolve a discovery dispute concerning the proper scope of interrogatories). Additionally, given the similarity between the federal and Colorado discovery rules governing expert disclosures, *compare* C.R.C.P. 26(a)(2)(C)(III), *with* Fed.R.Civ.P. 26(a)(2)(D)(ii), federal case law addressing expert rebuttal disclosures also informs our analysis. *See Gall ex rel. Gall v. Jamison,* 44 P.3d 233, 234–35 (Colo. 2002) (considering federal case law to interpret Rule 26).

¶ 22 In Colorado, rebuttal evidence "may take a variety of forms, including any competent evidence which explains, refutes, counteracts, or disproves the evidence put on by the other party, even if the rebuttal evidence also tends to support the party's case-in-chief." *People v. Welsh,* 80 P.3d 296, 304 (Colo.2003) (citation and internal quotation marks omitted). The party offering rebuttal evidence "must demonstrate that the evidence is relevant to rebut a specific claim, theory, witness or other evidence of the adverse party." *Id.* Thus, Colorado evidentiary rules afford a party presenting rebuttal evidence significant leeway so long as the evidence rebuts some portion of an opposing party's claim. *See id.*

¶ 23 With Colorado's approach to rebuttal evidence in mind, we turn to federal case law for guidance on how to determine whether an expert disclosure properly rebuts an opposing party's disclosure. *See Garrigan v. Bowen,* 243 P.3d 231, 235 (Colo.2010) (considering federal case law to interpret a portion of Rule 26 regarding expert witnesses); *see also 103 Investors I, L.P. v. Square D Co.,* 372 F.3d 1213, 1217 (10th Cir.2004); *Golden Nugget, Inc. v. Chesapeake Bay Fishing Co.,* 93 Fed.Appx. 530, 536 (4th Cir.2004) (Permitting rebuttal expert testimony though the testimony "could have been more clearly delineated."); *see generally Walter Int'l Prods., Inc. v. Salinas,* 650 F.3d 1402, 1410 (11th Cir.2011) (excluding expert testimony where party failed to provide a description of the type of rebuttal testimony the expert antici-

pated providing); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.,* 73 F.3d 546, 571 (5th Cir.1996) (striking defendants' rebuttal disclosures because they were "sketchy and vague" and therefore did not comply with the case management order).

¶ 24 The most instructive guidance is provided by *103 Investors I, L.P.* 372 F.3d at 1217. In that case, a group of investors sued the manufacturer of an electrical distribution system alleging that the manufacturer's system caused a fire on a floor of the investors' building. *Id.* at 1214. The trial court dismissed the investors' claims on summary judgment, in part, because it determined that the investors' rebuttal disclosures posited an "entirely new theory of negligence" from the theory advanced in the investors' original expert disclosures. *Id.* at 1215 (internal quotation marks omitted).

¶ 25 The Tenth Circuit reversed. *Id.* at 1218. It noted that the investors' initial reports identified the cause of the fire as an internal malfunction in the manufacturer's electrical system. *Id.* at 1217. In contrast, the manufacturer's disclosures theorized that the fire was caused by "an outside source and [therefore] not [by] a manufacturing defect." *Id.* More specifically, the manufacturer's expert report claimed that the fire was "a result of infiltration of water and chemicals" into the electrical system. *Id.* (citation omitted). In the rebuttal disclosures ultimately dismissed at trial, one of the investors' experts reasoned that the contamination "inside the [electrical system] must have occurred during the manufacturing process." *Id.* at 1218. The trial court struck this rebuttal disclosure on the ground that it presented a novel theory, and was therefore improper. *Id.* at 1215.

¶ 26 The Tenth Circuit disagreed and provided guidance for Fed.R.Civ.P. 26 expert rebuttal disclosures: "While we are sympathetic to the [trial] court's concerns that no new theories be introduced at such a late stage of the discovery process, our review of the expert reports [reveals, that the investors' rebuttal report] did not espouse a new theory." *Id.* at 1218. Rather, the investors' rebuttal disclosures merely "label[ed] the cause more specifically as a manufacturing

defect" and, therefore, did not violate the rebuttal disclosure rules. *Id.*

¶ 27 The trial court made a comparable error in this case. Dr. Shott's testimony attacked the NEACP report relied upon by Exempla's experts. It refuted the theory underlying Exempla's causation analysis. That it concomitantly helped the Wardens' case-in-chief does not mean it was an improper rebuttal disclosure. *See Welsh,* 80 P.3d at 304. In fact, the Wardens could not appreciate the importance of the NEACP report until after Exempla's disclosures because only then could the Wardens understand the extent to which Exempla's experts planned to rely on the report. Thus, the order striking Dr. Shott's expert rebuttal evidence improperly required the Wardens to anticipate Exempla's theory of the case. *See e.g., Taylor v. Mazzola,* 150 Colo. 553, 557, 375 P.2d 96, 99 (1962) ("A party is not required to anticipate the testimony the opposing party will offer in defense.").

¶ 28 Moreover, like the investors' rebuttal disclosures in *103 Investors I, L.P.,* Dr. Shott's testimony did not offer an entirely new theory of the case. Instead, it undercut Exempla's causation theory by attacking the NEACP report on which Exempla's experts relied. The trial court here, like the trial court in *103 Investors I, L.P.,* took too narrow a view of Dr. Shott's testimony and improperly conflated rebuttal testimony addressing a specific subset of a defendant's expert disclosures with a novel theory.

¶ 29 In brief, neither Colorado precedent regarding rebuttal testimony nor Tenth Circuit guidance addressing expert rebuttal disclosures supports the trial court's order striking Dr. Shott's testimony as improper. Therefore, the trial court abused its discretion in striking Dr. Shott's rebuttal testimony.

### B. Dr. Cokely and Dr. Wilson

¶ 30 Dr. Cokely's and Dr. Wilson's testimony regarding Noah's life expectancy likely should have been included in the Wardens' initial disclosures because it went directly to the damages element of their negligence claim.[3] Nonetheless, the trial court abused its discretion when it struck the life expectancy testimony because Exempla was not harmed by the late disclosure. *See* C.R.C.P. 37(c)(1); *Todd,* 980 P.2d at 978.

¶ 31 Rule 26(a)(2)(C) sets the sequence for expert witness disclosures. *See* C.R.C.P 26(a)(2)(C)(I)-(III). Subject to the trial court's discretion in setting discovery deadlines through a case management order,[4] initial disclosures "shall be made at least 126 days (18 weeks) before the trial date." C.R.C.P. 26(a)(2)(C)(I). The defending party then has 28 days from the claimant's initial disclosures to disclose its expert witnesses. C.R.C.P. 26(a)(2)(C)(II). The claimant's rebuttal experts, the final round of expert disclosures, must happen "77 days (11 weeks) before the trial date." C.R.C.P. 26(a)(2)(C)(III). Where parties do not timely comply with the expert disclosure requirements, the trial court may sanction the delinquent party. *See* C.R.C.P. 37(c)(1) (permitting sanctions for violations of expert disclosure requirements during discovery).

¶ 32 The trial court has broad discretion in managing discovery, including an ability to issue discovery sanctions. *Mayer v. Dist. Court,* 198 Colo. 199, 202, 597 P.2d 577, 578 (1979) ("Ordinarily, pretrial discovery rulings are within the broad discretion of the trial court."). But the trial court's discretion cannot change the rule and "Rule 37(c) provides for the exclusion of non-disclosed evidence unless the failure to disclose is *either* substantially justified *or* harmless to the opposing party." *Todd,* 980 P.2d at 977; *see also* C.R.C.P. 37(c)(1). "A party offering

---

**3.** This medical malpractice action falls within the purview of Colorado's Health Care Availability Act. *See* § 13–64–204(2), C.R.S. (2012). That provision provides that a claimant must prove future damages "including life expectancy, if appropriate." *Id.* Arguably, then, the effect of Noah's medical condition on his life expectancy should have been addressed in the Wardens' case-in-chief. *See also Heller–Mark & Co. v. Kas-*

*sler & Co.,* 37 Colo.App. 267, 269, 544 P.2d 995, 997 (1976) ("In negligence cases generally, the burden of proof is on the plaintiff to establish both causation and damages." (citations omitted)).

**4.** The Magistrate in this case set special expert disclosure deadlines.

late-disclosed evidence bears the burden of showing that the failure to disclose was harmless." *City of Aurora ex rel. Util. Enter. v. Colo. State Eng'r*, 105 P.3d 595, 610 (Colo.2005). In *Todd*, this Court provided a list of "non-exhaustive [factors] meant to highlight some areas of inquiry that are often relevant" in determining whether a claimant's failure to disclose was either substantially justified or harmless. 980 P.2d at 978. The Wardens do not contend that their failure was substantially justified. Accordingly, we only consider factors suggesting their error was harmless.

¶ 33 *Todd* indicates the following factors are relevant for determining whether late disclosure was harmless:

(1) The importance of the witness's testimony;

(2) the potential prejudice or surprise to the party against whom the evidence is offered;

(3) the availability of a continuance to cure such prejudice;

(4) the extent to which introducing such evidence would disrupt trial; and

(5) the non-disclosing party's bad faith or willfulness.

*Id.*

¶ 34 Three of the five factors require trial courts consider the timing of the errant disclosures vis-à-vis the trial. *Id.; see Berry*, 208 P.3d at 248 (Holding that "[p]laintiff's failure to comply with the discovery deadline was harmless to [the defendant] because the trial date has not been set and [d]efendant's opportunity to defend against the evidence has not been compromised."). In *Todd*, the late disclosure was harmless in large part because an unrelated "continuance [gave the potentially-prejudiced defendant] more time to prepare its case." 980 P.2d at 980. Consequently, analyzing the harm caused by a late disclosure necessarily begins with considering the timing of the late disclosures relative to the trial date.

¶ 35 In light of the advanced trial date in this case, and considering the specific *Todd* factors, the Wardens' late disclosures were harmless. The trial was continued to February, 2013; and, as in *Todd*, the continuance

was unrelated to the defective disclosures. *See id.* The continuance provides Exempla time to prepare for Dr. Cokely's and Dr. Wilson's expanded testimony, thus weighing against any prejudice Exempla might claim. *See Berry*, 208 P.3d at 251 (finding no prejudice, in part, because the defendant had sufficient time to depose the late expert witness). Moreover, any prejudice to Exempla is slight when compared to the importance of this testimony to the Wardens' negligence claim. The trial court improperly failed to consider the testimony's importance. *See id.* at 250.

¶ 36 As for the "surprise" factor, the substance of the late disclosure directly addresses Exempla's experts' life expectancy testimony. Therefore, any surprise suffered by Exempla only concerns the evidence's impact on Exempla's defense; this is not the type of surprise warranting sanctions under Rule 37. *See Todd*, 980 P.2d at 979 ("In evaluating whether a failure to disclose evidence is harmless under Rule 37(c), the inquiry is not whether the new evidence is potentially harmful to the opposing side's case."). Exempla cannot argue they are surprised by any information in the late disclosures in the manner required to support Rule 37(c) sanctions because Noah's life expectancy is an important part of the negligence action and Exempla's experts had addressed the issue in their own disclosures.

¶ 37 Similarly, the third *Todd* criterion—the extent to which the late disclosure might disrupt trial—is not implicated here because the trial is still months away, and the late disclosure only requires Exempla to consider a sliver of additional testimony from two previously disclosed experts. *See Todd*, 980 P.2d at 979.

¶ 38 Finally, nothing in the record indicates that the Wardens acted in bad faith or delayed these expert disclosures to gain a tactical advantage. Rather, the record suggests that the Wardens initially opted for an abridged damage assessment that relied on the statutory mortality tables. Although omitting the medical testimony regarding Noah's life expectancy in their case-in-chief was short-sighted, including this information in the rebuttal disclosures, without more, does not suggest bad-faith.

¶ 39 Considering the *Todd* factors, the Wardens' failure to properly disclose expert rebuttal testimony was harmless because the excluded testimony is important to the Wardens' case, should not have surprised Exempla, did not disrupt the trial, and there is nothing to suggest the Wardens acted in bad faith. Accordingly, the trial court abused its discretion when it struck Dr. Cokely's and Dr. Wilson's rebuttal testimony regarding Noah's life expectancy.

## VI. Conclusion

¶ 40 The trial court abused its discretion when it excluded Dr. Shott's rebuttal testimony because her testimony properly refuted a central theory of Exempla's defense. The trial court also abused its discretion when it excluded Dr. Cokely's and Dr. Wilson's testimony because the tardy disclosure of their life expectancy testimony did not harm Exempla. We accordingly vacate the trial court's order striking the testimony at issue, make the rule absolute, and direct the trial court to conduct further proceedings consistent with this opinion.

Justice EID and Justice BOATRIGHT do not participate.