No. 111,954

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

EDWARD M. BEREAL,
*Appellant*,

v.

RAVI K. BAJAJ, M.D.,
and
WESLEY MEDICAL CENTER, L.L.C.,
*Appellees*.

SYLLABUS BY THE COURT

1.

The admission of expert testimony generally lies within the trial court's sound discretion, and its decision will not be overturned in the absence of an abuse of discretion.

2.

An appellate court reviews a trial court's exclusion of an expert's rebuttal testimony under K.S.A. 2015 Supp. 60-226(b)(6)(C)(ii) for an abuse of discretion.

3.

A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. Moreover, an abuse of discretion occurs if discretion is guided by an erroneous legal conclusion or goes outside the framework of or fails to consider proper statutory limitations or legal standards.

1

4.

Rebuttal evidence is properly admissible under K.S.A. 2015 Supp. 2015 Supp. 60-226(b)(6)(C)(ii) when the evidence is intended solely to contradict or rebut the defense expert's evidence, even if the rebuttal evidence would tend to support the party's case-in-chief.

Appeal from Sedgwick District Court; WILLIAM SIOUX WOOLLEY, judge. Opinion filed April 1, 2016. Affirmed in part, reversed in part, and remanded with directions.

*Jonathan Sternberg*, of Jonathan Sternberg, Attorney, P.C., of Kansas City, Missouri, and *Thomas M. Warner* and *Anne H. Pankratz*, of Warner Law Offices, P.A., of Wichita, for appellant.

*David S. Wooding* and *Marcia A. Wood*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellee Ravi K. Bajaj, M.D.

*John H. Gibson* and *G. Andrew Marino*, of Gilliland & Hayes, LLC, of Wichita, for appellee Wesley Medical Center, L.L.C.

Before ARNOLD-BURGER, P.J., GREEN and STANDRIDGE, JJ.

GREEN, J.: This medical malpractice action arose after Edward Bereal went in for a heart catheterization during which air was improperly injected into his heart, causing an embolism and stroke. This resulted in Bereal being permanently paralyzed. The defendants, Dr. Ravi K. Bajaj and Wesley Medical Center, L.L.C., do not dispute that air was improperly injected into Bereal's heart, injuring him. Instead, the defendants maintain that his injuries occurred as a result of a defect in the medical device used for the heart procedure and, thus, the manufacturer of the medical device was responsible for Bereal's injuries. The manufacturer of the medical device was originally a party in this case. But after a settlement agreement was reached between Bereal and the manufacturer, Bereal dismissed the manufacturer as a party from the case.

2

Following a 21-day jury trial, the jury found in favor of the defendants. On appeal, Bereal asks this court to review the trial court's order striking the testimony of Bereal's rebuttal expert witness, Dr. Suzanne Parisian, M.D. In addition, Bereal contends that the trial court erred in allowing one of the defendants' experts to testify to conclusions that were outside the scope of the disclosed expert's pretrial report. Moreover, Bereal asserts that the defendants' expert's testimony was speculative and should have been stricken. Finally, Bereal contends that the trial court erred when it failed to grant him a judgment as a matter of law on all six of the defendants' affirmative defenses.

Of these three issues, we hold in Bereal's favor on the first issue. We conclude that the trial court abused its discretion when it excluded Dr. Parisian's rebuttal testimony because her testimony was intended solely to contradict or rebut the defense expert's causation theory and therefore constituted proper rebuttal testimony. We therefore affirm in part, reverse in part, and remand for a new trial.

In 2009, after complaining of chest pains, Bereal was referred to Dr. Ravi Bajaj, a cardiologist at Wesley Medical Center, L.L.C. (Wesley). Dr. Bajaj scheduled Bereal for a cardiac catheterization, commonly known as a heart catheter, on December 11, 2009.

On December 11, 2009, Bereal came to Wesley for his heart catheter procedure. Dr. Bajaj was the physician, Travis January was the monitoring nurse, Stacy Cody was the scrub tech, and Michael Stilwell was the circulating nurse.

Three weeks before Bereal's procedure, Wesley's Medrad Avanta (Avanta) fluid injection system that was used during Bereal's procedure, received a software upgrade which allowed the user to hit one button to purge both the saline and contrast lines simultaneously. These types of upgrades were common and occurred regularly.

3

Normally, this is a routine outpatient procedure which Dr. Bajaj had performed roughly 15,000 times. Nevertheless, it is undisputed that during Bereal's procedure, air was injected into his heart, causing an embolism and stroke, which resulted in his lengthy inpatient care and permanent paralysis.

*Mechanics of a Cardiac Catheterization Using the Avanta System*

All of the parties agree that the following is a fair and accurate statement describing the mechanics of a cardiac catheterization procedure using the Avanta system that was used in this case:

"In a cardiac catheterization, long, thin tubes called 'catheters' are placed in the patient's heart, and radiopaque contrast dye is injected into the patient's heart, the flow of which can be seen on an x-ray fluoroscope. The procedure takes measurements of circulation pressures, blood flow, and oxygenation, and provides visualizations called 'angiograms' so as to recommend how to treat heart problems. As with Mr. Bereal, the 'most common reason' a heart cath is performed is to look for blockages in coronary arteries.

"Besides the physician, the procedure also involves a circulating nurse, a monitoring nurse, and a scrub tech. The monitoring nurse monitors the patient's vital signs and angiograms from an adjoining room, obtains information from the other team members, and also documents and keeps track of the procedure for records. The circulating nurse ensures the patient is comfortable and gives and documents any medication the physician orders, including the type, weight, and amount of contrast. The scrub tech prepares the patient, stays sterile, and assists the physician; only the physician and scrub tech are sterile.

"The physician begins by inserting a tiny 'femoral catheter' in the patient's groin, through the femoral artery, and into the aorta in the heart, where it is under pressure. To inject the dye, the physician uses either a hand-injection procedure or a power injector such as the Avanta Fluid Injection System manufactured by Medrad, which was used in

4

Mr. Bereal's procedure. The Avanta or another power injector 'is a required piece of equipment in all cath labs.' The angiograms are x-ray images of the procedure showing the dye going into the patient's heart and out into the vessels. Using the Avanta, the physician hits a foot pedal, contrast goes in, and an image is taken, with each process taking only four seconds.

"Besides contrast, saline also can be injected to flush the machine and ensure that catheters are clean. A pressure transducer is connected, measuring blood pressure in real time by translating fluid pressure into blood pressure as a 'wave form,' a 'sine wave' visible on the monitoring screen.

"Contrast and saline are separately stored in the Avanta's injector head, with a line primed from each storage and strung through the machine. Essentially, the Avanta has plastic catheter tubing attached to it, which in turn is attached to the femoral catheter already inserted inside the patient. Fluid under 400 PSI to 700 PSI of pressure in the Avanta then is injected into the patient's heart through catheters that are themselves at 1200 PSI.

"It is crucial that all the tubing—both the Avanta's catheters and transducer and the catheter in the patient—must be purged of air; there is 'no margin of error' for this. Otherwise, it is 'extremely dangerous to the health and safety of a patient:' due to 'block[ing] the blood flow to the heart and to the brain,' air injection can cause serious injury, including stroke, and even death."

Dr. Bajaj and Cody were responsible for purging all of the air from the catheters and the Avanta system for Bereal's procedure. Both Dr. Bajaj and Cody testified that they properly purged the system of air and that no one noticed any defects or cracks in the catheters before the procedure began.

During the first injection, an unusual problem occurred which caused Bereal's heart rate to drop. After Dr. Bajaj stabilized Bereal, he unhooked Bereal from the Avanta system and switched to hand contrast injections to continue the procedure.

5

After the procedure, Bereal was transferred to intensive care where he suffered a stroke which paralyzed him. After receiving over 2 months of inpatient care and rehabilitation, Bereal was discharged with a final diagnosis of stroke caused by an air embolism from the heart catheter procedure.

At trial, all of the parties agreed that Bereal had suffered an "intravascular air embolism." The parties presented conflicting expert testimony in an effort to explain how the air got into the Avanta system.

*Bereal's Medical Experts*

Bereal presented two medical experts who testified that air was in the tubing before the first injection occurred and that air did not enter the system through a defect or malfunction of the Avanta equipment.

Bereal's first expert, Karen Harris, a supervising cardiovascular technologist at Massachusetts General Hospital, testified that bubbles were visible on the angiograms which showed that air came out of the catheter first and entered the aorta and then the dye. Based on the angiogram image, Harris testified that this showed that there was no failure in the Avanta system because "the air that was injected was the first thing that came out of the catheter," meaning the air "was much further into the patient than the [Avanta] system. . . . The air was the first thing to come out." Harris also relied on the wave forms to support her testimony that air was in the femoral catheter before the first injection. Harris explained that the wave forms were "dampened," which could be caused by air somewhere in the Avanta system. Harris explained that there were only six ways air could have entered Bereal's system and if any one of those occurred it would have been a departure from the standard of care.

Bereal's second expert, Dr. Michael Fifer, a cardiologist from Boston, Massachusetts, agreed with Harris' conclusion that air got into the Avanta system as a result of negligence by Wesley personnel. Dr. Fifer testified that in his opinion Dr. Bajaj failed to aspirate the catheter after making the wet-to-wet connection, failed to fill the catheter with X-ray dye before entering the coronary artery, failed to observe that the wave form was dampened before the first injection, and failed to recognize the possibility that there was air in the system, all of which were deviations from the standard of care.

*Defense Medical Experts*

Dr. Layne Reusser, an interventional cardiologist who practices in Wichita, Kansas, testified as a standard-of-care expert witness for Dr. Bajaj. Dr. Reusser countered Dr. Fifer's opinions, testifying that Dr. Bajaj had met the standard of care in aspirating the catheter before making the wet-to-wet connection; that the standard of care does not require a cardiologist to fill the catheter with dye before the first injection; and that in his opinion, the wave form was not dampened before the first injection.

Dr. Bajaj also testified on his own behalf as an expert witness. Dr. Bajaj testified that the wave form was not dampened before the first injection and that he is not required to fill the catheter with dye before the first injection. Dr. Bajaj testified that air in the tubing is very easy to see and that after 24 years there is no way he would have missed air bubbles in the line. Dr. Bajaj testified that he estimated that 10-15 ccs of air were injected into Bereal. Dr. Bajaj explained that this volume of air was greater than the volume in the entire line and, thus, he concluded that the air had to have come in externally from outside the tubing. Dr. Bajaj further testified that he met the standard of care in this case and that he was "really quite convinced . . . that this was a device malfunction."

Dr. Yadin David, a biomedical engineer, was the defense's final expert witness. Dr. David testified that the pressure isolation valve was defective. Dr. David based this

7

conclusion on the fact that Medrad, the manufacturer of the Avanta system used in this case, has made three different pressure isolation valves since 2009. Bereal's attorney objected to this testimony, arguing that it was outside the scope of Dr. David's report. The trial court overruled the objection, finding that the opinion regarding the pressure isolation valve was within the scope because his report stated the air injection was caused by "a defect in the Avanta or associated tubing."

*Striking of Rebuttal Expert*

On February 3, 2014, Bereal timely served his rebuttal expert report disclosing Dr. Suzanne Parisian as his expert to rebut Dr. David's report. In her report, Dr. Parisian criticized Dr. David's analysis and his opinions "primarily due to his failure to review critical manufacturing, compliance and regulatory data [which was] unacceptable for a regulatory/safety device analysis and render[ed] his opinions speculative at best." Dr. Parisian's report further stated that "there is no evidence that the Medrad [Avanta] device or any of the disposables were defective. In fact, the evidence is to the contrary."

On February 18-19, 2014, Wesley and Dr. Bajaj each moved to strike Dr. Parisian as a rebuttal expert, arguing that her testimony would be duplicative of both Dr. Fifer and Harris. Bereal opposed the motion, arguing that his disclosure was timely, that Dr. Parisian was an authorized rebuttal expert, and that her testimony was not duplicative because his original two experts were not medical device experts.

On February 27, 2014, the trial court held a hearing on the motion. After hearing arguments, the trial court granted the defendants' motions and struck Dr. Parisian as a rebuttal expert. The trial court held that because Bereal originally brought products liability claims against Medrad and that the defendants' affirmative defenses of products liability were against Medrad, "whatever you had to say about the equipment you needed

8

to say it in your original disclosure," and not in rebuttal. The trial court denied Bereal's motion to reconsider.

A 21-day jury trial was conducted between March and April 2014. After just 1 1/2 hours of deliberation, the jury reached a unanimous verdict finding neither Dr. Bajaj nor Wesley at fault for Bereal's injuries. Bereal appealed.

*Did the Trial Court Err in Striking the Testimony of Bereal's Rebuttal Expert Witness, Dr. Suzanne Parisian?*

In his first issue on appeal, Bereal argues that the trial court erred when it excluded Dr. Parisian's rebuttal expert testimony because her testimony would have specifically refuted the testimony of defense expert Dr. David and, therefore, constituted a proper rebuttal disclosure under K.S.A. 2015 Supp. 60-226(b)(6)(C)(ii).

The admission of expert testimony generally lies within the trial court's sound discretion, and its decision will not be overturned in the absence of an abuse of discretion. *Puckett v. Mt. Carmel Regional Medical Center*, 290 Kan. 406, 444, 228 P.3d 1048 (2010). A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106, *cert. denied* 134 S. Ct. 162 (2013). Moreover, an abuse of discretion occurs if discretion is guided by an erroneous legal conclusion or goes outside the framework of or fails to consider proper statutory limitations or legal standards. See *Graham v. Herring*, 297 Kan. 847, 855, 305 P.3d 585 (2013).

K.S.A. 2015 Supp. 60-226(b)(6)(C) requires the parties to disclose their experts in the time and sequence as ordered by the court. No Kansas case has been cited nor have we found one that addressed the admissibility of rebuttal experts under K.S.A. 2015

9

Supp. 60-226, except when dealing with the timeliness of the disclosure of the expert. That is clearly not the issue in this case since it is undisputed that Dr. Parisian was timely disclosed as a rebuttal expert. In the absence of direct authority, we must draw guidance from other jurisdictions involving the testimony of a rebuttal expert. Because the federal and Kansas discovery rules which govern expert disclosures are identical, we may look to federal caselaw for guidance. See Fed. R. Civ. P. 26(a)(2)(D)(ii); K.S.A. 2015 Supp. 60-226(b)(6)(C)(ii).

Rebuttal expert testimony

"must relate to and rebut evidence or testimony on the same subject matter identified by another party . . . . Such evidence is not tied to any particular witness; it is tied to whether the party with the affirmative burden has presented evidence and/or testimony from a duly disclosed expert on the same subject matter as that which will be rebutted by the disclosed rebuttal expert. [Citation omitted.]" *Bleck v. City of Alamosa*, *Colorado*, No. 10-CV-03177-REB-KMT, 2012 WL 695138, at *4 (D. Colo. 2012).

"The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *RMD, LLC v. Nitto Americas, Inc.*, No. 09-2046-JAR-DJW, 2012 WL 5398345, at *11 (D. Kan. 2010); see also *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004) ("Rebuttal evidence is properly admissible when it will 'explain, repel, counteract or disprove the evidence of the adverse party.'"). An appellate court reviews a trial court's exclusion of an expert's rebuttal testimony under K.S.A. 2015 Supp. 60-226(b)(6)(C)(ii) for an abuse of discretion. See *Ohlmeir v. Jones*, 51 Kan. App. 2d 1019, 360 P.3d 447 (2015).

K.S.A. 2015 Supp. 60-226(b)(6)(C)(ii) allows rebuttal testimony if the evidence is intended "solely to contradict or rebut" other expert testimony. The defendants' focus on these key words in the statute to support their argument that Dr. Parisian's report was not proper rebuttal testimony. The defendants argue that Dr. Parisian's rebuttal evidence was

10

duplicative of Bereal's two experts: Dr. Fifer and Harris. Thus, they argue that Dr. Parisian's rebuttal testimony would have inappropriately bolstered Bereal's case-in-chief. As a result, they argue that Dr. Parisian should have been disclosed as an expert in Bereal's case-in-chief.

Nevertheless, if the opinion of a rebuttal expert "explains, refutes, counteracts, or disproves the evidence put on by the other party, even if the rebuttal evidence also tends to support the party's case-in-chief," it should not be stricken. See *People v. Welsh*, 80 P.3d 296, 304 (Colo. 2003). Here, Dr. David, who was not a medical doctor, singled out Medrad, the manufacturer of the medical device, Avanta, as the sole culprit for the injection of air into Bereal's aorta during the heart catheterization procedure. To illustrate, Dr. David testified that "Medrad failed to behave as a reasonably prudent manufacturer of medical device by failing to warn the staff and the physicians at Wesley . . . about problems relating to air injection associated with the Avanta Injector System." In like manner, Dr. David testified that he "found 119" reports "of air injections . . . associated with the Avanta" on the Internet, of which he "looked at about 70."

The testimony of Dr. David, however, would have been contradicted by the rebuttal testimony of Dr. Parisian, who is both a doctor of medicine and an expert in the area of the Food and Drug Administration (FDA) approved radiological medical products. Dr. Parisian's rebuttal testimony would have refuted the theory underlying Dr. David's causation analysis. Dr. Parisian's rebuttal testimony would have undercut Dr. David's testimony by explaining as follows:  that Dr. David's "liberal use of various public FDA documents which he obtained from the internet" was flawed, inappropriate, superficial, speculative, misstated, and incomplete; that he "failed to create a valid engineering root cause analysis"; that his "report lacks valid scientific or regulatory methodology and credible evidence to establish that Medrad's device performed defectively"; that his assumptions about clinical conduct were "unsupported"; that his brushing away user error was wrong; and that he did not engage in any proper design

11

review of the Avanta system. In short, Dr. Parisian would have testified that "Dr. David's methodology, primarily due to his failure to review critical manufacturing, compliance and regulatory data is unacceptable for a regulatory/safety device analysis and render his opinions speculative at best." Moreover, Dr. Parisian would have testified that "there is no evidence that the Medrad [Avanta] device or any of the disposables were defective. In fact, the evidence is to the contrary."

Because Dr. Parisian's rebuttal evidence was intended solely to contradict, rebut, explain, counteract, or disapprove the testimony of Dr. David, it would not have been cumulative. The fact that Dr. Parisian's rebuttal evidence would have also helped support Bereal's case-in-chief does not mean that it was an improper rebuttal disclosure. See *Welsh*, 80 P.3d at 304 (Rebuttal evidence is admissible even if the rebuttal evidence also tends to support the party's case-in-chief).

Turning our attention to the defendants' argument and the trial court's ruling that Dr. Parisian should have been disclosed in Bereal's case-in-chief, we note that Bereal's claims against Bajaj and Wesley involved their failure to meet the proper standard of care. Bereal had no reason to present a products liability expert in his case-in-chief until it was disclosed that the defendants were presenting a products liability expert in their defense. As a result, the trial court's order striking Dr. Parisian's expert rebuttal evidence improperly required Bereal to anticipate Bajaj's and Wesley's theory of the case. See *Taylor v. Mazzola*, 150 Colo. 553, 557, 375 P.2d 96 (1962) ("A party is not required to anticipate the testimony the opposing party will offer in defense.").

We are further guided in this inquiry by *Warden v. Exempla, Inc.*, 2012 CO 74, 291 P.3d 30 (2012), where the Colorado Supreme Court reversed a trial court's order striking a timely disclosed rebuttal expert. The *Warden* court held that the trial court had abused its discretion in excluding the rebuttal expert's testimony because it properly rebutted the defendant's expert's conclusions regarding the cause of injury. 291 P.3d at

12

34-36, ¶¶ 18-29. In reaching this decision, the *Warden* court noted that the rebuttal expert did not offer a new theory of the case; instead, the expert undercut the defense's expert by attacking the report the defense expert relied on. 291 P.3d at 36, ¶ 28.

The facts presented in *Warden* are very similar to the facts of this case, and the conclusion of the Supreme Court of Colorado that it was an abuse of discretion to strike the timely designated rebuttal expert is persuasive.

Nevertheless, Wesley argues that any error in excluding Dr. Parisian's rebuttal testimony was harmless. Wesley bases its argument on *Dickerson v. St. Luke's South Hospital, Inc.*, 51 Kan. App. 2d 337, 346 P.3d 1100 (2015). In that case, this court recently held in a wrongful death action that where a jury found the named parties not at fault, error in excluding nonparties from the verdict form was harmless. 51 Kan. App. 2d at 354-55. Similarly, Wesley argues that because the jury found the named defendants not at fault in this case, the reasoning applied in *Dickerson* is equally relevant to this case. We disagree. The *Dickerson* holding stands in stark contrast to this case.

In support of its harmless error determination, the *Dickerson* court stated: "[T]he jury determined the named defendants were not at fault indicates that the jury believed the defendants' theory of the case—Nicole did not die because of a Vasotec error." 51 Kan. App. 2d at 355. We are unable to say the same in this case. Dr. David was the principal defense expert on the theory of causation. As stated earlier, Dr. David singled out the Avanta medical device as solely responsible for the injection of air into Bereal's aorta during the heart catheterization procedure. If the jury believed Dr. David's unrebutted causation testimony, it would have certainly found, as it did, that the defendants were not at fault. Nevertheless, Dr. Parisian's excluded rebuttal testimony would have refuted a central theory of Dr. David's conclusion. We are unable to say with any degree of certainty that the jury would have found that the defendants were not at fault if the trial court had not excluded Dr. Parisian's rebuttal testimony. Had the trial

13

court allowed the jury to hear and to consider Dr. Parisian's rebuttal testimony, the jury might have found the other way. Thus, Wesley's reliance on *Dickerson* is misplaced.

Accordingly, we conclude that the trial court erred when it excluded Dr. Parisian's rebuttal testimony because her testimony was intended solely to contradict or rebut the defense expert's causation evidence and therefore constituted a proper rebuttal disclosure under K.S.A. 2015 Supp. 60-226(b)(6)(c)(ii).

*Did the Trial Court Err in Allowing Dr. David to Testify to Conclusions That Were Outside the Scope of His Disclosed Pretrial Report?*

Next, Bereal argues that the trial court erred in allowing Dr. David to testify to two separate conclusions that were outside the scope of his report. Specifically, Bereal complains that the trial court incorrectly overruled his objections to two of Dr. David's conclusions: (1) that the large volume of air injected into Bereal supported his opinion that the air injection was caused by a device failure; and (2) that the pressure isolation valve was defective. In response, the defendants maintain that both conclusions were simply a matter of Dr. David giving additional detail about his opinions and were within the scope of his report.

"A trial court has broad discretion regarding the admissibility of expert testimony." *Frans v. Gausman*, 27 Kan. App. 2d 518, 527, 6 P.3d 432, *rev. denied* 270 Kan. 897 (2000). Again, we review this under an abuse of discretion standard.

As Bereal points out, K.S.A. 2015 Supp. 60-226(b)(6) requires disclosure of expert testimony before trial:

14

"(6) *Disclosure of expert testimony.* (A) *Required disclosures.* A party must disclose to other parties the identity of any witness it may use at trial to present expert testimony. The disclosure must state:

(i) The subject matter on which the expert is expected to testify; and

(ii) the substance of the facts and opinions to which the expert is expected to testify.

"(B) *Witness who is retained or specially employed.* Unless otherwise stipulated or ordered by the court, if the witness is retained or specially employed to provide expert testimony in the case, or is one whose duties as the party's employee regularly involve giving expert testimony, the disclosure under subsection (b)(6)(A) must also state a summary of the grounds for each opinion."

Dr. David's pretrial report disclosed that in his opinion the air injection was the "result of a defect in the Avanta or associated tubing that allowed air to enter during this initial injection." Dr. David's report also disclosed that "it is more likely than not that the connections within the disposable sets, even though properly attached, allowed air to enter the system."

*Amount of Air Testimony*

At trial, Bereal objected after Dr. David testified to the following:

"Q: Okay. Dr. David, what is the testimony that you reviewed telling you about the amount of air that was injected into Mr. Bereal?

"A. There's several sources for that volume of air. One is the plaintiff cardiologist expert, Dr. Fifer, identify that a significant, large amount of air. The second one was Dr. Bajaj testimony that is more definitive, call for, I believe, 7 to 15 cc volume air, and there is cine [MRI] images that is showing air entered.

15

"Q. Okay. What does that volume, that amount of air, suggest to you?

"A. If you look at the engineering of the disposable set that conducting the contrast and the saline fluid from the injector to the patient, you take all this length of tubing and you calculate the volume within that is about 5 cc space, and discussion is that the air that we know to be entered into Mr. Bereal is larger than that, then it's obvious that there is external source of air not only expendable by the volume was in the catheter."

Bereal immediately objected arguing that this opinion was outside the scope of Dr. David's report and that it also went to causation of Bereal's injury, which was outside the scope of the order in limine. After hearing argument, the trial court overruled Bereal's objection finding that the testimony was not a causation opinion.

The defendants argue that this issue is controlled by K.S.A. 60-456(b) and rely on *Munoz v. Clark*, 41 Kan. App. 2d 56, 199 P.3d 1283, *rev. denied* 289 Kan. 1279 (2009), for support. Under K.S.A. 60-456(b), an expert is permitted to continue to form opinions even at trial:

"'If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness.'

"See also *Plains Transp. of Kan., Inc. v. King,* 224 Kan. 17, 21, 578 P.2d 1095 (1978) ('The introduction of opinion or expert testimony is controlled by K.S.A. 60-456. An expert must base his testimony upon facts personally perceived by or known to him or made known to him at the hearing.')." *Munoz*, 41 Kan. App. 2d at 68.

In *Munoz*, our court affirmed the admission of expert testimony over objection that the opinions were not within the scope of the expert's report. The *Munoz* court held that

16

the opinion was based on facts made known to the expert at the jury trial and that the opinions were within the scope of the expert's special knowledge, skill, and experience. Thus, the court found the evidence was admissible under K.S.A. 60-456(b). 41 Kan. App. 2d at 68.

The same analysis can be applied in this case. Here, Dr. David explained in his testimony that he reviewed Dr. Fifer's testimony and Dr. Bajaj's testimony regarding the amount of air that was injected into Bereal to form his opinion that the air injection came from an external source and not from the femoral catheter and tubing. Based on *Munoz* and K.S.A. 60-456(b), Dr. David was permitted to continue to form opinions even at the trial as long as that opinion was within the scope of his expertise. Therefore, because this opinion was within the scope of Dr. David's special knowledge, skill, and experience and was also based on facts made known to him at the jury trial, we determine that the evidence was admissible. As a result, the trial court did not abuse its discretion in allowing this evidence to come in.

*Pressure Isolation Valve Testimony*

Later, while Dr. David was testifying, he was asked to explain his theory on how the air entered the single patient tubing (SPAT) during the initial injection. (By way of explanation, the SPAT is a specialized tubing that connects to the multipatient tubing (MPAT). The SPAT connects to a femoral catheter inserted into the patient's femoral artery through an incision near the groin. The MPAT, however, connects directly into the injector.). Dr. David responded as follows:

> "We have a system, that is correct, it is serving high-pressure injection from the Medrad device into the MPAT and the SPAT, the disposable system. However, the pressure that is going down the line is creating what I would call a Venturi effect. The Venturi effect is the effect that if you have a flow of fluid and there is [an] opening, the air from the

17

atmosphere would be sucked in. So in order to reconcile all the evidence we have here, it seems to me that the proper explanation would be that the pressure isolation [valve] was defective, did not serve its purpose, and was open to external air to allow to be sucked in when the injection began."

Dr. David continued to discuss the pressure isolation valve for an additional 10 pages of testimony before Bereal objected. Bereal objected after Dr. David testified that "the only way to reconcile the facts that were just described here in Court is by determining that the pressure isolation valve was defective." The trial judge overruled Bereal's objection and later gave the following explanation for overruling his objection:

"Mr. Warner [Bereal's counsel] made an objection [based on being] outside the scope of the report, and I didn't have counsel approach or anything, I just overruled the objection. And basically when I'm looking at Page 10 of his report, this is what—why I did it. It says, the air injected into Mr. Bereal entered the Avanta tubing, or catheter, upon the initial injection as a result of a defect in the Avanta or associated tubing that allowed air to enter into this initial injection.

"All right. So that—that was the basis of my ruling which was while that may be a broad opinion, the question that was asked was within the scope of that broad question. And so that's why I overruled the objection."

Wesley contends that Bereal failed to preserve this issue for appeal regarding the testimony about the pressure isolation valve because he failed to make a timely and specific objection at trial as required by K.S.A. 60-404.

In *State v. King*, 288 Kan. 333, 341-50, 204 P.3d 585 (2009), our Supreme Court held that K.S.A. 60-404 provides that a judgment shall not be reversed on account of the "erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

18

Moreover, we are duty bound to follow the rule in *King* absent some indication the court is departing from this ruling. See *Farley v. Above Par Transportation*, 50 Kan. App. 2d 866, 877, 334 P.3d 883 (2014), *rev. denied* 302 Kan. __ (July 24, 2015). Our Supreme Court has applied *King* in a variety of contexts since then; therefore, we see no indication that the court is departing from *King*.

Under the analysis required by *King*, we note that Bereal did not object when Dr. David began testifying that the pressure isolation valve was defective. When he did object, Dr. David had already been discussing the pressure isolation valve for 10 pages of the trial transcript testimony. Based on the late objection to the pressure isolation valve testimony, we conclude that Bereal has failed to preserve this issue for appeal.

In addition, based on the broad language in Dr. David's report, we cannot say that the trial court abused its discretion in finding that this testimony was within the scope of Dr. David's report.

*Was Dr. David's Evidence Speculative?*

Before trial, Bereal moved to exclude Dr. David's testimony as speculative. The trial court ultimately denied the motion. Again, Bereal failed to note this decision in his brief and does not challenge the trial court's decision. As a result, his argument fails.

*Was Bereal Entitled to Judgment as a Matter of Law on All Six of the Defendants' Affirmative Defenses of Products Liability?*

Finally, Bereal argues that he should have been granted judgment as a matter of law on the affirmative defenses at the conclusion of the evidence for two reasons: (1) The defendants failed to overcome certain statutory presumptions set forth in the Kansas

Product Liability Act (KPLA), K.S.A. 60-3301 *et seq.*; and (2) Dr. David's testimony was speculative and failed to identify which aspect of the Avanta system was defective.

Defendant Bajaj argues that Bereal's argument fails for three reasons: (1) This case was not decided based on comparative fault; (2) Bereal improperly requests this court to disregard Dr. David's expert opinions even though he failed to show, or argue, that they were inadmissible; and (3) Bereal incorrectly argues that the defendants raised affirmative defenses under the KPLA.

A trial court's decision on a motion for judgment as a matter of law is reviewed under the former directed verdict standard of review. *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 706, 317 P.3d 70 (2014); see K.S.A. 2015 Supp. 60-250.

When ruling on a motion for directed verdict, the trial court is required to resolve all facts and inferences that may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied. An appellate court must apply a similar analysis when reviewing the grant or denial of a motion for judgment as a matter of law. *City of Neodesha v. BP Corporation*, 295 Kan. 298, 319, 287 P.3d 214 (2012); see *Bussman*, 298 Kan. at 706-07.

*Bereal's Argument Regarding the KPLA*

During pretrial motions the following statements were made:

"[Defense counsel:] . . . It's true we're going to have to meet the burden of proof for our comparative fault defense. But those are the common-law elements in the product liability claim we're going to have to fulfill and we intend to do so. It doesn't have

anything to do with disproving or proving—disproving the defenses that are in the Kansas Product Liabilty Act.

    . . . .

"[THE COURT:] '"I agree, and—and I'm holding as a matter of law because no one's really been able to convince me otherwise that the KPLA does not apply to Medrad comparative fault claim because the company is no longer a party. It's someone who's not a party. And so I agree with the arguments and the briefs on that. So to the extent that it might apply if Medrad were still in, it doesn't apply.'"

In his brief, Bereal assumes that the KPLA applies to the defendants' affirmative defenses. Bereal failed to note that the trial court held that the KPLA did not apply to the defendants' affirmative defenses. Bereal has failed to challenge the trial court's decision on this point. Instead, he has built his claim on an inference that he has not argued or proved. Thus, his argument fails.

Affirmed in part, reversed in part, and remanded for a new trial.